**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| RUSSELL CLAY DAWES, Jr., *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-11-3250 |
| | § | |
| IMPERIAL SUGAR COMPANY, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

Carpenters Pension Fund of Illinois sued Imperial Sugar Company and two of its officers, Chief Executive Officer John C. Sheptor and Senior Vice-President and Chief Financial Officer Harold P. Mechler, alleging securities fraud under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(A), and Rule 10b-5, 17 C.F.R. § 240.10b-5. Carpenters sought to represent a class of investors who purchased Imperial's stock between December 29, 2010 and August 5, 2011. During this period, according to Carpenters, the defendants artificially inflated Imperial's stock price. Carpenters alleged that the defendants concealed ongoing operational difficulties that limited the amount of sugar Imperial could refine and pack, requiring it to pay other companies, including competitors, to refine and pack sugar for Imperial to purchase and sell to its own customers, increasing its expenses and reducing its profit margins.

The defendants have moved to dismiss the consolidated class action complaint, (Docket No. 40 (Compl.)), under Federal Rules of Civil Procedure 12(b)(6) and 9(b), and under the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C § 78u–4(b)(2). (Docket Entry No. 42). Carpenters has responded, (Docket Entry No. 48), and the defendants have replied, (Docket Entry

No. 52). Based on the pleadings; the motion, response, and reply; the record; and the relevant law, the defendants' motion to dismiss is granted, without prejudice and with leave to amend no later than **October 30, 2013**. A status conference is scheduled for **November 14, 2013,** at 9:00 a.m. in Courtroom 11-B.

The reasons for this ruling are explained below.

## I.    Background

### A.    The Plaintiffs' Allegations

Founded in 1843 in what is now Sugar Land, Texas, Imperial Sugar is one of the largest refiners and distributors of cane sugar in North America. (Compl. ¶¶2, 27). Ninety-eight percent of Imperial's net sales are from refined sugar. Imperials sells a wide variety of sugar products, including granulated, powdered, liquid, and brown sugars. These products are marketed under several private labels and brand names, including Dixie Crystals®, Imperial®, and Holly®. (Compl. ¶2). Imperial sells to retailers, restaurant chains, distributors, food manufacturers, and individuals. During the relevant period, Imperial's common stock was publicly traded on the NASDAQ. (Compl. ¶24).

Imperial does not grow its own sugar, but rather purchases raw sugar that it refines, packages, and sells. As a nonintegrated sugar producer, Imperial's profit margins depend in part on the spread between prices for the raw sugar that it purchases and the refined sugar that it sells. During the relevant period, Imperial had a 50 percent interest in Wholesome Sweeteners, Inc., which produced organic cane sugar, agave syrup, honey, and other specialty sweeteners. (Compl. ¶29). Imperial also had a 50 percent interest in Ingenios Santod, S.A. de C.V., which owned and operated five sugar mills and markets sugar products in Mexico and the United States. (*Id.*).

At the beginning of the class period, Imperial owned a sugar refinery in Port Wentworth, Georgia and one in Gramercy, Louisiana.  In the 2007 fiscal year, the Port Wentworth refinery was responsible for 60 percent of Imperial's total refining capacity.  (Compl. ¶28).  On February 7, 2008, a major industrial accident at the Port Wentworth refinery killed and injured several dozen workers.  (Compl. ¶30).  Production was suspended for more than a year.  (Compl. ¶31).  In mid–2009, Imperial restarted limited production at Port Wentworth, but struggled to reach preaccident levels.  (Compl. ¶32).  Imperial used the insurance money it received after the accident to rebuild the refinery's packaging operations, including installing new equipment.  (Compl. ¶33)  According to an anonymous former Imperial employee who worked as a senior buyer for raw sugar and packaging, Imperial's employees did not know how to operate the new equipment.  (Compl. ¶32).  The former senior buyer estimated that between June 2010 and June 2011, the Port Wentworth refinery operated at 40 percent of its preaccident capacity.  (*Id.*).

The complaint included other allegations based on statements attributed to unnamed former employees.[1]  According to a process-engineer team leader who worked for Imperial between

------

[1]  The complaint relied extensively on statements by the following five unnamed former Imperial employees:

- A former senior buyer who worked for Imperial from June 2010 to June 15, 2011 whose responsibilities included purchasing raw sugar and packing materials.  The complaint stated the former buyer "was responsible for all contract negotiations and the entire supply chain budget and created all purchase orders for all the sugar th[at Imperial] contracted to purchase from suppliers."  (Compl. ¶32 n. 4);

- A process-engineer team leader who worked for Imperial from February 2010 to November 2011 and was in charge of the "Process Engineering for the Programmable Logic Control," which was used for packing at Port Wentworth.  (Compl. ¶33 n. 5);

- A senior logistics manager who worked for Imperial from May 2006 to January 2011 at Imperial's Sugar Land, Texas headquarters and oversaw "every aspect of [Imperial's] logistics, including warehousing, trucks, and bulk and liquid stations."  (Compl. ¶33 n. 6);

February 2010 and November 2011, the "old mill" refinery at Port Wentworth was not rebuilt after the accident because Imperial did not have enough money to do so.  (Compl. ¶33).  As a result, the Gramercy refinery focused more on packaging and less on refining.  Throughout 2010, Gramercy refined only enough sugar to fill one railcar per day, far less than its alleged preproduction capacity of six railcars per day.  (Compl. ¶34).

In November 2009, Imperial entered into a joint venture with Cargill, Inc. and Louisiana Sugar Growers and Refiners, Inc. (SUGAR), known as the Louisiana Sugar Refinery, LLC (LSR). (Compl.¶29).  Each of the three joint-venture members was required to contribute $30 million in assets or capital.  (Compl.¶35).  At the end of 2010, Imperial contributed land and its Gramercy refinery.  According to the former Imperial senior logistics manager who served as an anonymous source, Imperial had to enter into the joint venture because Louisiana's two main sugar growing cooperatives formed relationships with Imperial's major competitors.  (Compl.¶36).  One of those competitors, Cargill, was planning  to build a refinery two miles away from Imperial's Gramercy refinery.  (*Id.*).  Imperial was concerned that unless it entered into a joint venture with Cargill, the Gramercy refinery would loose access to the raw sugar it needed for its operations.  The bulk sugar-packing part of the Gramercy refinery's business — packing refined sugar into 25, 50, and 100 pound bags — was included in Imperial's contribution to the joint venture, but Imperial was allowed

- A retail customer-service representative who worked for Imperial "for 10 years" before September 2011 and "was responsible for managing several accounts, including Wal-Mart and Meadowbrook Meats," and reported to the master planner."  (Compl. ¶38 n. 7);

- A customer-service representative who worked for Imperial for "approximately five years" before October 2011 and who was "contracted out to provide customer service on behalf of Michigan Sugar" and prepared invoices from Michigan Sugar to Imperial Sugar.  (Compl. ¶ n. 10).

to keep some of its small packaging lines.  (Compl.¶37).  According to the senior logistics manager, this caused Imperial to lose around 50 percent of its revenue from the Gramercy refinery.  (*Id.*).

A retail customer-service representative who worked for Imperial from 2001 until September 2011 provided information that the company had difficulties filling customer orders after the Port Wentworth refinery accident.  According to this source, Imperial's daily Late Report and Daily Cuts Reports after the accident showed frequent delays of between one week and three months in filling many customer orders.  (Compl.¶38).  This source stated that Sheptor told the customer-service representatives "to go after the business, when he knew we couldn't service them." (Compl.¶ 39).

In the fall of 2010, Imperial began providing sugar under a private label to two Wal-Mart distribution centers that supplied around 50 Wal-Mart stores.  Wal-Mart required five to six truckloads of sugar per day for each distribution center.  (Compl.¶40).  Each truckload consisted of 42,500 to 48,000 pounds of sugar.  (*Id.*).  Wal-Mart alone took up 70 percent of Port Wentworth's packaging capacity.  According to the former senior buyer and the retail customer-service representative, on February 1, 2011 Imperial lost Wal-Mart as a customer after missing the deadlines for many shipments. (Compl.¶41).  In early 2011, Imperial also lost Meadowbrook Meats and Swank as customers due to late shipments.  (*Id.*).

Carpenters alleged that to meet customer demand, Imperial turned to other companies, including its competitors.  (Compl.¶43).  Imperial paid these companies to "copack" sugar that Imperial refined.  According to the former senior buyer, after the Gramercy plant closed, around 50 percent of Imperial's "retail" sales came from copacked sugar.  (Compl. ¶44). U.S. Sugar was "by far" Imperial's largest copacking partner, packing five or six truckloads of sugar for Imperial every

week.  (Compl. ¶46).  That relationship was in place when the former senior buyer began working for Imperial Sugar in June 2010.  (*Id.*).

Carpenters asserted that the cost of copacking and purchasing refined sugar from third parties hurt Imperial's profit margins.  According to the former senior buyer, Imperial paid a "tolling fee" of around 50 to 60 cents per pound of copacked sugar, which was 15 to 20 cents more per pound than for sugar Imperial packed itself.  (Compl. ¶¶48, 50).  According to this source, Imperial paid around $500,000 per month to competitor U.S. Sugar for copacking services.  (Compl. ¶48).  Carpenters alleged that because some of the copacking arrangements were with competitors, Imperial had to disclose proprietary pricing and customer information, causing additional financial harm.  (Compl. ¶50).

Besides purchasing packaging services, Imperial also had to purchase refined sugar from domestic and Mexican sources, including some competitors.  Imperial's former senior manager of logistics stated that in 2010, Imperial purchased between 10 and 20 railcars of refined sugar from its competitor, CSC Sugar, LLC, on 5 or 6 occasions.  (Compl. ¶51).  According to the former senior buyer, whose responsibilities included creating purchase orders, between June 2010 and June 2011 Imperial also purchased refined sugar from U.S. Sugar, Michigan Sugar Company, and Santos. (Compl. ¶52).  The customer-service representative who worked for Imperial for the five years before October 2011 stated that Imperial purchased sugar from third parties on a daily basis in 2011.  These purchases were necessary because "Imperial was pushing product [it] didn't have" and was having trouble meeting orders from large customers such as General Mills and Kellogg's.  (Compl. ¶53). Carpenters alleged that Imperial's failure to fill orders strained its relationships with those

customers.  Carpenters claimed that this also prevented Imperial from increasing the price of the refined sugar it sold to offset rising raw sugar prices.

According to Imperial's former senior logistics manager, the decrease in Imperial's operating margins was directly related to the Port Wentworth refinery's inability to meet customer demand. (Compl.¶56).  This former manager stated that Imperial did not include in its budget projections the added transportation costs of purchasing and copacking refined sugar.  He believed that "purchasing the refined sugar impacted margins" because Imperial was paying more for the sugar others refined and packed than for sugar it refined and packed internally.  (Compl. ¶55).  This manager also stated that the Port Wentworth problems were widely known to the defendants.  According to this manager, Sheptor participated in daily calls with the Port Wentworth refinery manager and received a daily "email tracker" that detailed the refinery's performance and goals.  Sheptor had an office at the plant and was frequently there.  (Compl.¶57).  The former customer-service representative stated that Sheptor held monthly town hall meetings and "would always acknowledge the problems at Port Wentworth."  (*Id.*).

Imperial's former retail customer-service representative similarly stated that Sheptor was aware of the delays in filling customer orders.  According to this representative, Sheptor was "getting the same reports we were" and discussing them with Imperial's "master planner."  (Compl. ¶58).  The former senior manager of logistics stated that Imperial tracked its sales and orders in a program called Foresight.  When the information provided by the Foresight program indicated that Imperial needed to purchase more sugar, Imperial's sales director would discuss it with Sheptor, who "had the final say on all purchases."  (Compl. ¶59).  The former senior buyer corroborated this

point and stated that he participated in monthly conference calls that included Sheptor and Mechler, during which they would discuss market prices for sugar and margins.  (Compl. ¶60).

During the class period, raw sugar prices rose.  Competition also increased from Mexican sugar companies aggressively seeking to enter the United States market.  According to Imperial's former senior buyer, the company was not able to increase its refined-sugar prices because "our customers were all watching what our competition was charging."  (Compl. ¶62).  As a financial analyst tracking Imperial stock noted in a December 1, 2011 report, "[i]t is difficult to increase price to customers that have experienced order delays in the past or are generally concerned about [its] ability to deliver."  (*Id.*).

###### B.     The Allegations as to Imperial's Public Statements

Carpenters alleged that between December 29, 2010 and August 5, 2011, the defendants concealed Imperial's financial and competitive conditions through misstatements and omissions. On December 29, 2010, the first day of the proposed class period, Imperial issued a press release summarizing its fourth quarter and 2010 fiscal year results.  The press release quoted Sheptor stating as follows:

> As production rates at the Port Wentworth refinery increased during the year, we identified facility and process modifications necessary to return the refinery to historical operating levels.  We completed the last major modification in October 2010, and output improved significantly.  While production days and fixed costs had a negative impact on fiscal 2010 results, the improvements that we have made should lead to sustained results at higher rates in 2011.

(Compl. ¶66).

That same day, Imperial issued a Form 10-K that it filed with the S.E.C. for the fiscal year ending on September 30, 2010.  The Form 10-K included the following statements:

8

- "Co-packers are used under contract for small volume specialty products";

- "The Port Wentworth refinery's production ramped up during fiscal 2010 following the restart of the refinery which occurred in the summer of 2009"; and

- "Sales volumes increased 51.9% primarily due to the ramp up in production volume from the Port Wentworth refinery, partially offset by decreased sugar purchased from other producers."

(Compl.¶67).

After the Form 10-K's release, Rafferty Capital Markets noted that Imperial's 2010 results "point to a dramatic improvement in production at Port Wentworth, up to 12,494k cwt in 2010 from 1,146k cwt in 2009." (Compl. ¶72(a)). The report concluded that "[t]oday's results indicate IPSU's Port Wentworth refinery is improving capacity utilization as expected [and] . . . we believe IPSU is well-positioned for a return to profitability in F2011." (*Id.*).

On December 30, 2010 Imperial held a conference call with securities analysts. Sheptor made the following statement in his opening remarks:

> Results in the fourth quarter were negatively influenced by a 4.4 million pound average daily melt rate at the Port Wentworth refinery that constrained our sales volume. The refinery performance did not improve from the previous quarter, forcing us to purchase contract cover from other suppliers, and in some cases causing default on contract delivery resulting in customer complaints . . . .

> During the first week of October, we made changes to the refinery process at the Port Wentworth plant in an attempt to resolve obstacles in production that we had encountered. These changes resulted in significantly improved performance, enabling a 13% melt rate increase, resulting in an October-November average rate of 5.1 million pounds per day. In this period, many production days exceeded our historical average rate of 5.9 million pounds per day.

(Compl. ¶69).

Sheptor characterized this as "a huge success and a critical step forward to returning the refinery to pre-tragedy capacity." (*Id.*). He also noted that "2010 was a year challenged with recovery, a 30-year raw sugar high — raw sugar price high, and expectations not met." (*Id.*). He explained:

> In general, we achieved sales volumes in the past two quarters in line with pre-accident levels at a time when prices for both refined sugar and raw cane sugar, our largest input cost, are at historically high levels. Our margin basis — I should say, on a margin basis, we have been successful thus far at maintaining acceptable spreads between raw and refined sugar prices.

(Compl. ¶70).

In response to an analyst's question, Mechler stated that he was "pleased with the performance of the Port Wentworth refinery . . . in October–November" but noted that Imperial "reduce[d] production rates in December." (Compl. ¶71). In response to another question, Sheptor stated that Imperial expected the Port Wentworth refinery to reach November 2010 production levels in January 2011, once the construction of a new silo was completed. (*Id.*). Sheptor stated in response to a third question that he did not anticipate any customer delay charges in that quarter and was "not aware of any customer issues that are not covered in the charges we took last year." (*Id.*).

Following the call, PAA Research LLC projected that Imperial's shares would rise in 2011. It noted that:

> senior management has not been as optimistic about ongoing production levels at the company's Port Wentworth refinery over the past two-years as they were . . . today on the earnings conference call. For a management team that generally likely to keep expectations low, we were encouraged by their confidence that the Port Wentworth refinery could achieve daily production volumes of 5.5–6.0MM lbs/day once the silo repairs are completed.

(Compl. ¶72(b)).

10

On February 7, 2011, Imperial issued a press release announcing its first quarter fiscal 2011 financial results.  The press release noted that net sales had increased to $227.4 million from $173.8 million for the same period the previous year.  (Compl. ¶75).  The press release quoted Sheptor as stating that the  "process modification implemented in the Port Wentworth refinery at the beginning of October produced immediate improvements in refinery results."  (*Id.*).  Sheptor explained that the "refined silo repairs were completed by the contractor in mid-January and we anticipate placing the silos back in service in early February.  We are anxious to continue the ramp-up in production in Port Wentworth once the silos are on line."  (*Id.*).

On the same day, Imperial filed its Form 10-Q for the quarter ending December 31, 2010.  The Form 10-Q stated in part:

> Net sales increased 31% for the three months ended December 31, 2010, compared to the same period in the prior year.  Domestic sugar volumes increased 9.0% for the quarter primarily due to increased distribution at key retailers in the consumer channel.  Prior year's first quarter consumer sales volumes were constrained as individual packaging lines were initiated at the rebuilt Port Wentworth facility during the period.  Domestic sales prices increased 18.8% for the quarter.
>
> * * *
>
> Manufacturing costs per cwt in Port Wentworth improved compared to the same period last year as the increased average daily melt helped improve fixed cost absorption.  Repairs and maintenance cost increases along with higher depreciation partially offset the absorption benefit.  Port Wentworth total refined sugar production in the quarter increased over the prior year although daily production rates are still below normal levels achieved in fiscal 2006 and 2007.

(Compl. ¶76).

Imperial held a conference call with securities analysts on February 7, 2011.  (Compl. ¶78).  During this call, Sheptor stated that "[o]perations during the first six weeks of the quarter were

11

remarkably improved versus previous quarters due to the Port Wentworth refinery process change completed the first week of the fiscal year.  Daily melt rates steadily improved with the number of days surpassing the historical capacity." (*Id.*).  Sheptor summarized by stating, "[a]s we begin the new quarter, sales volumes have strengthened across all channels." (*Id.*).  Mechler added that, "[o]n a margin basis, thus far, we have largely been successful at maintaining acceptable spreads between raw and refined sugar prices." (Compl. ¶79). We did see improvements in Port Wentworth's unit manufacturing costs as throughput rates increased during the quarter." (*Id.*).  Mechler warned, however, that "[p]rices for both refined and raw cane sugar are at historically high levels and have demonstrated extraordinary volatility over the last 18 months." (*Id.*).  In response to an analyst's question about the effect of the Gramercy plant's closure, Mechler stated, "that Port Wentworth, the way it has been running, would, without Gramercy's higher cost, . . . improve gross margin." (Compl. ¶80).  In response to a different question, Mechler stated that Imperial had regained "substantially all of [the] retail distribution and that's the increase in consumer volumes that we saw during the current quarter." (Compl. ¶81).  Mechler also stated that "we have not had to pay slotting to regain that distribution." (*Id.*).  He acknowledged that "[o]ur promotional expenses and advertising expenses are a little up this quarter compared to [a] year ago, but that is more to reinforce the brand, particularly regionally in the Southeast." (*Id.*).

After the Form 10-Q and the conference call, PAA Research recommended Imperial's stock, noting that "IPSU is closer to achieving normalized production levels at Port Wentworth than at any point in the past 3-years . . . even with the silo issues at Port Wentworth the company achieved its highest average daily production rate in 1Q11 since the refinery accident." (Compl. ¶82(a)).  BWS Financial Inc. maintained its "hold" rating for the stock based on an assessment that "Port

Wentworth should see gradual improvement in refining capabilities over the next few months." (Compl. ¶82(b)).  Janney Capital Markets kept its "neutral" rating, also noting that Imperial's "manufacturing costs are improving as the capacity ramps and allows for fixed cost absorption." (Compl. ¶82(c)).

On May 10, 2011, Imperial issued a press release reporting its second fiscal quarter 2011 financial results.  This press release quoted Sheptor as stating that the "reconnection of the silos in Port Wentworth, which was deferred until the first week of April, went smoothly, and the refinery has begun to ramp up production rates again."  (Compl. ¶85).  According to Sheptor, Imperial "achieved sales price increases during the second quarter and successfully managed raw costs in a volatile price environment."  (*Id*.).  The press release stated that "[l]ower manufacturing costs and improved yields at the Port Wentworth refinery contributed to the improved operations results." (*Id*.).  "For the three months ended March 31, 2011, gross margin as a percent of sales increased to a positive 5.4% compared to a negative 19.6% in the prior quarter."  (*Id*.).  The press release continued by stating that "[a] reduction in sales volumes from the contribution of the Gramercy refinery was substantially offset by the ramp up in volumes at the Port Wentworth refinery."  (*Id*.). The Form 10-Q issued on the same day also noted improvements in Imperial's gross margin and the Port Wentworth refinery's manufacturing costs.  (Compl. ¶86).

In Imperial's quarterly conference call with analysts, Sheptor stated:

> It is with great pleasure that we announced a $0.34 per share earnings this quarter, the first profit for ongoing operations in three years.  It was 39 months ago that we experienced the tragedy in Port Wentworth, Georgia, and many people have worked diligently to help us complete this recovery.  We have accomplished an important milestone with our first profitable quarter, excluding insurance recoveries, and we are optimistic about our future.

(Compl. ¶88).

During this conference call, Sheptor also noted that "[s]ales and operations improvement [led] to significantly better margins" and that "[r]efinery yields have substantially improved and are approaching our historical best practice." (*Id.*). Sheptor responded to a question about the effect of the silo reconnection by stating, "[s]o our expectation is, with the silos online, that we don't have any process obstacles to elevate the refinery to capacity levels." (Compl. ¶89). In response to another question, Mechler acknowledged that "the results show that we oversold the second half of 2010 — overcommitted, and therefore, suffered some of the cover requirements for our customers, as we reported previously." (Compl. ¶90).

Following these statements, on May 11, Rafferty upgraded Imperial's stock from "hold" to "buy," explaining that "[a]lthough we have seen a significant run-up in the shares recently, we believe that with the silos at Port Wentworth now online, and production issues being ironed out in Gramercy, there is a greater level of confidence in the company's ability to return to sustained profitability." (Compl. ¶91(c)). On May 16, 2011, BWS Financial upgraded Imperial's stock from "hold" to "buy." (Compl. ¶91(d)). On June 2, Janney upgraded Imperial's stock from "neutral" to "buy." (Compl. ¶91(b)). PAA Research had classified Imperial stock as a "long" investment based on "expectations of improved price realization and higher margin levels as production rates at the company's refineries and packaging facilities improve." (Compl. ¶91(a)). In an August 2011 report, PAA noted that Imperial's stock price had "gained an astounding 71% since the company reported a big positive earnings surprise for 2Q11, compared to a -4% decline in the S&P 500." (*Id.*). PAA identified as one reason for the increase that "[i]nvestor recognition that the vast majority of the company's production issues at its Port Wentworth refinery are now behind it." (*Id.*).

Imperial's stock rose to $15.83 on May 16, 2011 and to $23.19 on August 4, 2011. This represented a 71.5 percent increase following Imperial's second quarter fiscal 2011 results. (Compl. ¶92).

On August 5, 2011, Imperial issued a press release announcing its third fiscal quarter 2011 results. The press release reported a $16.1 million net loss for the quarter. The press release stated that "[h]igher raw sugar cost which along with lower volumes reduced gross margin was the primary reason for the loss in the current quarter." (Compl. ¶95). This press release quoted Sheptor as stating that "[o]ur inability to increase prices in the face of higher raw sugar costs because of competitive pressures from domestic and Mexican sources was the principal driver of the quarter's disappointing results." (*Id*.). The press release continued:

> Manufacturing costs for the quarter did not improve from the same period in the prior year. The Port Wentworth refinery's progress toward full production rates was hampered by raw sugar quality and mechanical reliability, including significant interruptions in the steam boilers providing power to the plant. The refinery operated at an average daily melt rate of 4.5 million pounds, approximately 75% of average rates prior to the 2008 industrial accident.

(*Id.*)

Sheptor was quoted in the August 2011 press release as stating:

> "The Company is reviewing potential operating and capital improvements, particularly in the utilities, raw sugar melt and water management areas of the refinery, to begin addressing mechanical reliability in these operations. These areas, which were not part of the reconstruction efforts following the accident, have proved to be impediments to sustaining efficient operations at the production rates achieved prior to the accident."

(*Id.*).

Sheptor echoed the same themes in his quarterly conference call with investors. He stated:

> Capital expenditures totaled $20 million for the first nine months, which included completing the required improvements in Gramercy

15

> under the LSR agreement.  We expect to spend $25 million of capital
> expenditures for the full fiscal year 2011, principally on completing
> safety initiatives and normal replacement projects.  We are examining
> a number of potential projects at the Port Wentworth refinery, which
> are likely to maintain capital expenditures above historical capital
> replacement capital levels for the next several years.

(Compl. ¶96).

When asked during the conference call how Imperial's financial situation had changed so

quickly, Mechler stated:

> I think it comes back, as we summarized, to the margin compression,
> and the margin compression, at its root, traces to the inability to raise
> prices to match raw sugar costs. . . .  [W]hile we expected to and
> intended to and attempted to, we were not able to accomplish that
> during the quarter.

(Compl. ¶98).

Sheptor stated:

> If you look at the third quarter, on a volume basis, we met all of our
> orders and so we are not constrained on a sales side by production.
> Having said that, the efficiency is certainly — efficiency of how we
> produce is a key objective of the operations team, and they have not
> met the expectations that we had for the facility.  They have had
> continued reliability problems in the older part of the refinery that
> was not rebuilt after the industrial accident, and reliability is of
> significance in this quarter in the utilities area.

> \* \* \*

> It is becoming increasingly more clear that maintenance action alone
> isn't going to be sufficient to improve the operating reliability of the
> facility, and we are assessing what type of capital demands we will
> have to address reliability.  It isn't possible to predict for you when
> we will run at a different melt rate, and we certainly are giving all
> efforts possible from the operating team to make that sooner than
> later.

(Compl. ¶98).

16

Imperial stated in its Form 10-Q that its cash and cash equivalents fell from $2.9 million to $0.3 million and that its indebtedness to Bank of America, N.A. rose from $23 million to $78.8 million.  (Compl. ¶100).  The Form 10-Q warned:

> As a result of the Company's future cash needs, including for capital expenditures, pension contributions and margin requirements of the commodity futures program, as well as the need to fund possible future operating losses in the event current margin pressures continue, the Company's borrowing availability in the fourth quarter and beyond may be reduced to levels that would trigger the applicability of the financial covenants and other restrictions under the Credit Agreement.  In such an event, it is possible that the Company will not be in compliance with such covenants and will need to seek a waiver from its lenders in order to avoid an event of default under the Credit Agreement.

(*Id.*).

## C.    The Results of the August 2011 Disclosures

Imperial's stock price fell from $23.19 per share on August 4, 2011 to $7.79 per share on August 8, 2011.  During this time, Imperial's peer index did not decline.[2]  (Compl. ¶112).  A December 22, 2011 *Houston Chronicle* article concluded that "[i]t's unlikely, given the current price spreads for sugar and Imperial's position the market, that it's being undercut by cheap competitors."  (Compl. ¶105).  The article noted that, [a]s of September, the midwestern U.S. wholesale price for refined sugar was 57 cents a pound, and raw sugar was selling for about 39 cents, according to the U.S. Department of Agriculture."  (*Id.*)  This 18 cent price spread was "one of the highest since at least 1987, based on data from the U.S. Sugar Alliance."  (*Id.*).  For the past 25 years, the spreads were typically between 2 cents and 6 cents.  (*Id.*).

---

[2]  Imperial identified the American Stock Exchange Consumer Staple Index IXR as a relevant peer index in its fiscal year 2011 10-K.  (Compl. ¶112 n. 13).

This lawsuit was filed on September 1, 2011.  The plaintiffs asserted claims under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(A), and Rule 10b-5, 17 C.F.R. § 240.10b-5.  (Docket Entry No. 1).  On February 1, 2012, this court appointed Carpenters Pension Fund of Illinois to serve as the lead plaintiff under the PSLRA.  (Docket Entry No. 35).

On March 22, 2012, Carpenters filed its consolidated class action complaint under Federal Rule of Civil Procedure 23(a) and (b)(3).  The putative class was defined as all those who acquired the publicly traded common stock of Imperial between December 29, 2010 and August 4, 2011.  (Compl. ¶127).  The complaint alleged that in Imperial's S.E.C. filings, press releases, and conference calls during the class period, the defendants knowingly concealed the following information through their misstatements and omissions to the market:

- the Port Wentworth refinery continued to experience significant operational problems;

- Imperial was forced to participate in the LSR joint venture despite its negative effect on its refining capacity;

- the Port Wentworth refinery was unable to absorb the capacity loss from the Gramercy refinery's closing;

- Imperial did not disclose that it was continuing to purchase refined sugar from other suppliers and to use copackers;

- Imperial's fiscal 2010 charges did not resolve its customer issues;

- Imperial's operating costs increased, its margins eroded, and its competitors benefitted as a result of these problems;

- Imperial was suffering due to increased competition and industry changes that benefitted vertically integrated sugar producers; and

- Imperial was unable to raise prices due to increased competition and its strained relationships with customers.

18

(Compl.¶¶ 133-48). The complaint also alleged that Sheptor and Mechler are "control persons" liable under § 20(a). (Compl.¶ 146).

The defendants moved to dismiss Carpenters's § 10(b) claim for failing allege material misrepresentation, scienter, and loss causation as required under the Federal Rules of Civil Procedure and the PSLRA. (Docket Entry No. 42, at 10-24). The defendants moved to dismiss Carpenters's § 20(a) claim on the ground that it failed in the absence of a viable § 10(b) claim. (*Id.* at 25). Carpenters responded to the motion to dismiss and moved to strike several of the documents submitted with it. (Docket Entry No. 47, 48). The defendants replied to the response, (Docket Entry No. 52), and responded to the motion to strike, (Docket Entry No. 51), and Carpenters replied to the response to the motion to strike, (Docket Entry No. 55).

A hearing on the parties' motions was held on October 9, 2012. This court denied Carpenters's request to strike Exhibits D, E, L, and Q and the figures in the Sugar Production & Sales Chart that the defendants submitted with their motion to dismiss. (Docket No. 60). This court also denied Carpenters's alternative request to convert the defendants' motion to dismiss into a summary-judgment motion and to permit the parties to begin discovery. (*Id.*). This court took the defendants' motion to dismiss and Carpenters's motion to strike Exhibit M to that motion under advisement. (*Id.*). In a March 30, 2013 order, this court granted Carpenters's request to strike Exhibit M to the defendants' motion to dismiss. (Docket Entry No. 63).

This memorandum and order addresses the motion to dismiss. The legal and factual sufficiency of the complaint, including the exhibits appropriately considered with the motion, are analyzed against the governing legal standards.

## II.     The Legal Standards

### A.     Rules 8(a), 9(b), and 12(b)(6)

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief can be granted."  In *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), the Supreme Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2).  To withstand a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Id.* at 570; *see also Elsensohn v. St. Tammany Parish Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).  In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Supreme Court elaborated on the pleading standards discussed in *Twombly*.  The Court explained that "the pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).

For fraud claims, including securities fraud claims, Rule 9(b) also requires the complaint to "state with particularity the circumstances constituting the fraud."  FED. R. CIV. P. 9(b).  "Put simply, Rule 9(b) requires 'the who, what, when, where, and how' to be laid out."  *Benchmark Electronics, Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003); *see also Carroll v. Fort James Corp.*, 470 F.3d 1171, 1174 (5th Cir. 2006) ("In cases concerning fraudulent misrepresentation and omission of facts, Rule 9(b) typically requires the claimant to plead the type of facts omitted, the place in which the omissions should have appeared, and the way in which the omitted facts made the representations misleading." (internal quotation marks)).

20

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend under Rule 15(a) before dismissing the action with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal."); *see also Richardson v. Keffer*, 471 F. App'x 304, 305 (5th Cir. 2012) (per curiam) ("Although Rule 15 requires leave to be freely given, leave to amend . . . is by no means automatic." (internal quotation marks omitted)); *Mosley v. Bowie County*, 275 F. App'x 327, 328 (5th Cir. 2008) (per curiam) ("The record is devoid of reasons for the denial of leave to amend the complaint; accordingly, the denial of such leave constitutes an abuse of discretion."); *United States ex rel. Adrian v. Regents of the Univ. of Cal.*, 363 F.3d 398, 403 (5th Cir. 2004) ("Leave to amend should be freely given, and outright refusal to grant leave to amend without a justification . . . is considered an abuse of discretion." (internal citation omitted)).  A plaintiff, however, should be denied leave to amend a complaint if the court determines that the "proposed amendment . . . clearly is frivolous" or "advanc[es] a claim or defense that is legally insufficient on its face." 6 CHARLES A. WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1487 (3d ed. 2010); *see also Rio Grande Royalty Co. v. Energy Transfer Partners*, 620 F.3d 465, 468 (5th Cir. 2010) ("The trial court acts within its discretion in denying leave to amend where the proposed amendment would be futile because it could not survive a motion to dismiss.").

## B.      Section 10(b) of the Securities Exchange Act

Section 10(b) of the Securities Exchange Act makes it unlawful for any person, directly or indirectly, "[t]o use or employ, in connection with the purchase or sale of any security . . . any

manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [§] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated to enforce § 10(b), makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b).  To state a claim under § 10(b) and Rule 10b-5 Carpenters must allege, in connection with the purchase or sale of securities, facts suggesting that defendants (1) made a misstatement or omission, (2) of a material fact, (3) with scienter, (4) on which the putative class relied, (5) that proximately caused their injury. *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 227 (5th Cir. 2009).

Claims under § 10(b) and Rule 10b-5 must also satisfy the enhanced pleading requirements imposed by the PSLRA and Rule 9(b) of the Federal Rules of Civil Procedure.  *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 239 (5th Cir. 2009); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd. (Tellabs I)*, 551 U.S. 308, 320 (2007) (stating that the PSLRA "installed both substantive and procedural controls" that were "[d]esigned to curb perceived abuses of the § 10(b) private action [such as] nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers." (internal quotation marks and citations omitted)).  To allege a material misstatement or omission, the PSLRA requires a complaint to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1)(B).  The "complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state

22

of mind." 15 U.S.C. § 78u-4(b)(2)(A). The PSLRA's pleading requirements incorporate Rule 9(b)'s fraud-pleading standard, requiring a plaintiff to specify the allegedly fraudulent statements, the speaker, when and where the statements were made, and why they are fraudulent. *Id.*; *see also* FED. R. CIV. P. 9(b). A district court must dismiss a securities-fraud claim failing to satisfy either the PSLRA or Rule 9(b). *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 287 (5th Cir. 2006) (citing *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002).

In sum, to plead sufficiently under the Federal Rules of Civil Procedure and the PSLRA, a complaint must: (1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading. *Goldstein v. MCI Worldcom*, 340 F.3d 238, 245 (5th Cir. 2003). "This is the 'who, what, when, where, and how' required under Rule 9(b) in our securities fraud jurisprudence and under the PSLRA." *Id.* What constitutes particularity differs with the facts of each case. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 288 (5th Cir. 1992).

### 1.    Materiality

To be actionable, a misrepresentation or omission of a fact must be objectively material. *See Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, — U.S. —, — , 133 S. Ct. 1184, 1195 (2013) ("[T]he question of materiality . . . is an objective one . . . ." (internal quotation marks omitted)). "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" *Basic v. Levinson*, 485 U.S. 224, 231–32 (1988) (quoting *TSC Inds., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)); *see also Southland*

*Secs. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (noting that a fact is material if there is "a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder." (internal quotation marks omitted)).  The "total mix" of information includes information that is readily available to the general public and facts known or reasonably available to shareholders.  *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004).

The Supreme Court has been "careful not to set too low a standard of materiality for fear that management would bury the shareholders in an avalanche of trivial information."  *Matrixx Initiatives, Inc. v. Siracusano*, — U.S. — , —, 131 S.Ct. 1309, 1318 (2011) (internal quotation marks omitted)).  "[T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers."  *Lormand*, 565 F.3d at 248.  There is no bright-line rule for determining whether information withheld from a company's public disclosures is, or is not,  material.  *See Matrixx Initiatives*, 131 S. Ct. at 1324.  Instead, determining materiality is a "fact-specific inquiry . . . that requires consideration of the source, content, and context" of the allegedly omitted information."  *Id.* at 1321 (internal quotation marks and citation omitted); *see also Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir. 1994). ("[M]ateriality is not judged in the abstract, but in light of the surrounding circumstances." (internal quotation marks and footnote omitted)).

In this case, Carpenters alleged that the defendants not only made material misrepresentations, but also that they omitted facts that reasonable investors would consider material.  "The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action."  *Lormand*, 565 F3d. at 248.  The Fifth Circuit has

> long held under Rule 10b-5, a duty to speak the full truth arises when
> a defendant undertakes a duty to say anything. Although such a
> defendant is under no duty to disclose every fact or assumption
> underlying a prediction, he must disclose material, firm-specific
> adverse facts that affect the validity or plausibility of that prediction.

*Id.* (citing *Rubinstein*, 20 F.3d at 170).

The PSLRA created a "safe harbor" protecting individuals and corporations from liability for certain forward-looking statements that later prove false. To qualify for this protection, the statement must be "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement" or be immaterial. 15 U.S.C. § 78u–5(c) (1)(A)(i)-(ii). In this case, the defendants have not argued that the PSLRA's safe harbor applies.

### 2.    Scienter

Under the PSLRA, plaintiffs must state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C.A. § 78u-4(b)(2)(A). For "each act or omission alleged" to be false or misleading, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). Scienter requires "an intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 643 (5th Cir. 2005) (internal quotation marks omitted). "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even

inexcusable negligence, but an extreme departure from the standards of ordinary care." *Id.* (quotation marks and citation omitted).[3]

In *Tellabs I*, the Supreme Court described how to analyze the sufficiency of scienter allegations on a motion to dismiss a federal securities-fraud case under the PSLRA. 551 U.S. at 322–23. First, the district court must determine the factually sufficient complaint allegations and take them as true. *Id.* at 322. Second, the court considers documents incorporated in the complaint by reference and matters subject to judicial notice. *Id.* at 322–23. Third, a court must take into account plausible inferences opposing as well as supporting an inference of scienter. *Tellabs I*, 551 U.S. at 323. The factual allegations must be evaluated collectively, not in isolation, to determine whether a strong inference of scienter has been pleaded. *Cf. Barrie v. Intervoice–Brite, Inc*., 397 F.3d 249, 260 (5th Cir. 2005) ("While [the Fifth Circuit] will view a complaint *in toto* when considering whether a complaint has adequately pled scienter, each allegation of fraud must individually meet the particularity requirements of the PSLRA." (internal citation omitted)).

To be sufficient, the inference need not be "irrefutable, i.e., of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs I*, 551 U.S. at 324 (internal quotation marks omitted). But it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id.* "The strength of an inference cannot be decided in a vacuum." *Id.* at 323. "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323–24.

---

[3] In *Tellabs I*, the Supreme Court did not decide whether recklessness is sufficient for civil liability under §10(b) and Rule 10b–5 because the question was not presented in that case. The Court noted that the courts of appeals all permit §10(b) claims based on reckless behavior but define "recklessness" differently. *Tellabs I*, 551 U.S. at 319 n.1.

"[O]missions and ambiguities count against inferring scienter, for plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* at 326 (quoting 15 U.S.C. § 78u–4(b)(2)).  "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts allege." *Id.* at 324.

## III.    The Plaintiffs' Allegations of Material Misrepresentations and Scienter

The defendants move to dismiss on the ground that the complaint fails to identify, with sufficient specificity, the false or misleading statements the defendants made, either affirmatively or by omitting material information necessary to keep the statements from being false or misleading. The defendants identify some general or overarching deficiencies with the complaint, as well as specific deficiencies in each of the areas Carpenters alleged were false and misleading.  The arguments as to the general as well as the specific pleading issues are analyzed below.

### A.    General Pleading Issues

#### 1.    The Lack of an Alleged Motive for the Fraudulent Statements

Carpenters acknowledges that it has not pleaded a particular motive, financial or otherwise, for the defendants' allegedly fraudulent behavior.  Carpenters did not allege that either of the individual defendants traded Imperial stock during the class period or that they otherwise profited financially from their alleged misrepresentations and omissions.  The defendants contend that the failure to plead motive weighs against finding scienter.  Carpenters responds that shareholders can successfully plead scienter without alleging a particular motivation to defraud.

The Supreme Court addressed this issue in *Tellabs I*.  The Court explained that "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily

in favor of a scienter inference . . . the absence of allegation as to motive  is not fatal." *Tellabs*, 551 U.S. at 325.  "[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint."  *Id.* Nevertheless, appropriate motive allegations "'meaningfully enhance the strength of the inference of scienter.'"  *Southland*, 365 F.3d at 368 (quoting *Nathenson v. Zonagen Inc.*, 267 F.3d 400, 412 (5th Cir. 2001)).

In the Fifth Circuit, the absence of motive allegations is a factor in determining whether the complaint adequately pleads scienter.  "[W]here a defendant's motive is not apparent, a plaintiff may adequately plead scienter by identifying circumstances that indicate conscious behavior on the part of the defendant, but the strength of the circumstantial allegations must be correspondingly greater." *R2 Invs.*, 401 F.3d at 644–45 (internal quotation marks and emphasis omitted); *see also § v. Seghers*, 298 F. App'x 319, 334 (5th Cir. 2008).  This factor makes the Carpenters complaint's allegations of context and other facts necessary to infer scienter even more important.

### 2.    Group Pleading

In alleging scienter, the Carpenters complaint relies in part on group pleading.  The complaint stated, "[i]t is appropriate to treat Individual Defendants as a group for pleading purposes and to presume that the false, misleading, and incomplete information conveyed in the Company's public filings, press releases, and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified above."  (Compl. ¶ 23).

The defendants correctly note that the Fifth Circuit has rejected group pleading as inconsistent with the PSLRA.  *See Southland §. Corp.*, 365 F.3d at 365 (finding that group pleading "conflicts with the scienter requirement of the PSLRA because, even if a corporate officer's position

supports a reasonable inference that he likely would be negligent in not being involved in the preparation of a document or aware of its contents, the PSLRA state of mind requirement is severe recklessness or actual knowledge."); *Fin. Acquisition Partners LP*, 440 F.3d at 285 ("Unlike the Tenth Circuit, our circuit does not permit [group] pleading."). Courts in this circuit look to the state of mind of the individual corporate official who allegedly made, approved, or issued the statement at issue, or furnished information or language to include in the statement. It is insufficient to impute to each defendant a kind of collective knowledge of all the corporation's officers and employees acquired in the course of their employment. *Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009). The allegations claimed to show scienter on the part of each defendant must be analyzed individually to determine whether the complaint sufficiently pleads scienter as to that defendant. *Id.*; *see also Indiana Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532–33 (5th Cir. 2008) ("[T]his court has rejected the group pleading approach to scienter. . . . Consequently, it is only necessary for us to address the allegations claimed to adequately show scienter on the part of the named officers to determine whether the complaint sufficiently pleads scienter." (internal quotation marks omitted)). The rejection of group pleading requires plaintiffs pleading fraud claims against individuals under § 10(b) and Rule 10b–5 to distinguish among the defendants and allege each one's role, intent, and knowledge. *Southland*, 365 F.3d at 365 (explaining that courts may not "construe allegations contained in the Complaint against the defendants as a group as properly imputable to any particular individual defendant unless the connection between the individual defendant and the allegedly fraudulent statement is specifically pleaded.").

29

Carpenters contends in a footnote in its response to the motion to dismiss that it has sufficiently alleged scienter under what it refers to as "the prevailing theory of corporate scienter." (Docket Entry No. 48 at 29, n. 11).  The defendants respond that the Fifth Circuit has not endorsed "the corporate scienter doctrine" and that this court should decline to follow the cases Carpenters cites, which are from other circuits or from district courts in this circuit.  (Docket Entry No. 52 at 19, n. 11).  The Fifth Circuit has explained that "[a] defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time he or she makes the statement." *Southland*, 365 F.3d at 366.  Courts must "look to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like) rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the court of their employment." *Id.*  As under the common law, "the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual . . . ." *Id.*; *see also Makor Issues & Rights, Ltd. v. Tellabs Inc. (Tellabs II)*, 513 F.3d 702, 707 (7th Cir. 2008) ("The problem with inferring a collective intent to deceive behind the act of a corporation is that the hierarchical and differentiated corporate structure makes it quite plausible that a fraud, though ordinarily not a deliberate act, could be the result of a series of acts none of which was done with scienter and imputable to the company by the doctrine of respondeat superior.").

Carpenters acknowledges the Fifth Circuit case law but asserts that "in certain circumstances, scienter can be imputed to a corporate defendant even if it cannot be alleged with respect to any

individual corporate officer." (Docket Entry No. 48 at 29, n. 11). Carpenters relies on the Seventh Circuit's decision in *Tellabs II*. In that opinion, the Seventh Circuit noted that a plaintiff may be able "to draw a strong inference of corporate scienter without being able to name the individuals who concocted the fraud." 513 F.3d at 710. The court offered the hypothetical example of General Motors announcing that it had sold one million SUVs in a year when it had actually not sold any. In a lawsuit based on this announcement, even if the plaintiff could not name an individual officer responsible for the statement, "[t]here would be a strong inference of corporate scienter, since so dramatic an announcement would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false." *Id.*

Although the Fifth Circuit has not issued an opinion discussing the Seventh Circuit's approach, at least two district courts in this circuit have found the circumstances for inferring corporate scienter to be limited. In *In re Dell §. Litig.*, 591 F. Supp. 2d 877 (W.D. Tex. 2008), the court concluded that the facts alleged could not support an inference of corporate scienter to replace a showing of individual scienter. The court explained that the alleged misrepresentations were not "dramatic enough to assume corporate officials who were knowledgeable about the company generally would have known of their falsity at the time they were made." *Id.* at 899. In *In re B.P. p.l.c. Securities Litigation*, 843 F. Supp. 2d 712 (S.D. Tex. 2012), by contrast, the court found that the complaint was sufficient to give rise to an inference of corporate scienter. After the Deepwater Horizon Accident, BP had estimated that it could recover about 500,000 barrels of oil per day. Just over a month after the accident, BP and its contractors were recovering about 15,000 barrels per day. The court found that "the erroneous estimates climb very close to—if not exceed—the extraordinary nature of the facts envisioned by the Seventh Circuit." *Id.* at 790.

In this case, Carpenters's brief discussion of the issue fails to explain how the *Tellabs II* approach to inferring corporate scienter applies here.  Carpenters does not identify which of the allegedly false statements — whether by affirmative misrepresentation or by omission — are so dramatic as to support an inference that the individual officers knowledgeable about the company generally would have known that the statements were false when made.  There is no basis to find that the alleged misrepresentations meet the "extraordinary nature" of those envisioned in *Tellabs II*.  Carpenters cannot use corporate scienter to rely on group pleading to support an inference of the individual defendants' scienter.

### 3.     The Use of Confidential Sources

The defendants also point out that the consolidated complaint relies heavily on confidential sources to allege scienter, and contend that this should detract from the weight given to the statements by those sources.  "Confidential source statements are a permissible basis on which to make an inference of scienter."  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 552 (5th Cir. 2007) (citing *ABC Arbitrage*, 291 F.3d at 353).  The PSLRA does not require a plaintiff to provide names when the confidential witnesses "are identified through general descriptions in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source as described would possess the information pleaded to support the allegations of false or misleading statements."  *ABC Arbitrage*, 291 F.3d at 353.

In lieu of names, however, a complaint should give details such as (1) the person's job description, (2) individual responsibilities, (3) specific employment dates, and (4) where and when the confidential source came to know the information supporting an inference of scienter, such as

when a relevant comment was made to the confidential source.  *See Cent. Laborers' Pension Fund*, 497 F.3d at 552; *Indiana Elec.*, 537 F.3d at 538; *Southland Secs. Corp.*, 365 F.3d at 382.

Even when a complaint sets out such information, the Fifth Circuit has applied *Tellabs I* to require district courts to "discount allegations from confidential sources" because "[s]uch sources afford no basis for drawing plausible competing inferences."  *Ind. Elec.*, 537 F.3d at 535 (5th Cir. 2008); *see also Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007) ("It is hard to see how information from anonymous sources could be deemed 'compelling' or how we could take account of plausible opposing inferences. Perhaps these confidential sources have axes to grind. Perhaps they are lying.  Perhaps they don't even exist.").  In analyzing the complaint allegations here, the Fifth Circuit approach requires giving relatively less weight to the allegations from anonymous sources.

### 4.    The Sarbanes-Oxley Certifications

Carpenters alleged that Sheptor and Mechler signed Sarbanes-Oxley Act (SOX) Certifications affirming, among other things, that they had reviewed Imperial's S.E.C. filings and that those filings were free from material misstatements and fairly presented the company's financial condition.  (Compl. ¶¶ 68, 77, 87, 118).  Carpenters contends that the SOX certifications, in combination with other allegations, can serve as circumstantial evidence of scienter.

The Fifth Circuit addressed the relationship between SOX certifications and scienter in *Cent. Laborers' Pension Fund*, 497 F.3d 546; *see also Indiana Elec.*, 537 F.3d 527.  Relying on an Eleventh Circuit decision, the court "rejected a reading that would permit a strong inference of scienter from the certification alone." *Cent. Laborers' Pension Fund*, 497 F.3d at 555.  The court explained that, "'[i]f we were to accept [this] proffered interpretation of Sarbanes–Oxley, scienter

33

would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA.'" *Id.* (quoting *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006)). Instead, considering SOX certifications as part of the scienter analysis is proper only "if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Cent. Laborers' Pension Fund*, 497 F.3d 546 (internal quotation marks omitted); *see also Horizon Mgmt. Inc. v. H&R Block, Inc.*, 580 F.3d 755, 765–66 (8th Cir. 2009); *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981 (9th Cir. 2009).

The decisions that Carpenters cites in favor of considering the SOX certifications are either from other circuits, *see In re ProQuest §. Litig.*, 527 F. Supp. 2d 728, 743, 745 (E.D. Mich. 2007), or do not support its position, *see In re BP*, 843 F. Supp. 2d at 780 (declining to consider SOX certifications as part of the scienter analysis); *see also In re Franklin Bank Corp. §. Litig.*, 782 F. Supp. 2d 364, 378 (S.D. Tex. 2011) ("Nor does the fact that the defendant executed a statutorily-required [SOX] certification establish scienter."). Carpenters fails to point to any "glaring accounting irregularities" or "red flags," and none is apparent from its pleadings. Sheptor and Mechler's SOX certifications do not weigh in favor of finding scienter.

### 5.   The Use of Block Quotes

The defendants argue that the complaint fails to meet the PSLRA's pleading standards because of its heavy use of block quotations from the defendants' public statements. The defendants cite several decisions that are critical of plaintiffs' heavy reliance on large block quotes in securities fraud complaints. The courts' criticisms in those cases are not directed to the use of block quotes

34

in itself, but to the use of such quotes without specifically alleging the context in which they were made and what makes them false or misleading. *See McCasland v. FormFactor, Inc*., No. C07-5545, 2008 WL 2951275, at *7 (N.D. Cal. July 25, 2008) ("[T]he complaint here contravenes applicable pleading standards by juxtaposing the same series of generic conclusions against each set of block quotes, without differentiation or specificity."); *Tabor v. Bodisen Biotech, Inc*., 579 F. Supp. 2d 438, 452–53 (S.D.N.Y. 2008) ("Plaintiffs have not alleged exactly which statements . . . were false . . . Plaintiffs' use of large block quotes from § filings and press releases, followed by generalized explanations of how the statements were false or misleading are not sufficient to satisfy the heightened pleading requirements."); *In re Alamosa Holdings, Inc. §. Litig*., 382 F. Supp. 2d 832, 857–58 (N.D. Tex. 2005) ("Defendants also assert that Plaintiffs never specify which of the various statements mentioned in the preceding paragraphs are false or misleading. Thus, Defendants state, Plaintiffs have left it to the Court to guess which statements are false and misleading and why each statement is false and misleading. The Court agrees completely. . . . The Court will not waste its resources attempting to construe which statements are actionable and why each is actionable."); *In re Entrust §. Litig*., No. 2:00-CV-119, 2002 WL 31968321, at *3 (E.D. Tex. Sept. 30, 2002) ("The 'false and misleading statements' are sometimes entire block quotes from conference calls or analysts' reports. Some portions of the block quotes are in bold print or italicized, but the [complaint] makes no attempt to attribute any significance to bold print or italics."); *see also Williams v. WMX Tech*., 112 F.3d 175, 178 (5th Cir. 1997) ("A complaint can be long-winded, even prolix, without pleading with particularity. Indeed, such a garrulous style is not an uncommon mask for an absence of detail.").

In this case, the consolidated complaint does allege context in each of the areas identified as misrepresentations.  The issue is whether these specific areas, including the context,  are sufficiently pleaded under the Rule 9, 12(b)(6), and PSLRA standards.

**B.     The Specific Pleading Issues**

**1.     The Alleged Misrepresentations About Sugar Purchases From Third Parties**

Carpenters alleged that the defendants failed to disclose, incompletely disclosed, or misrepresented several facts relating to Imperial's purchases of refined sugar from other companies. The consolidated complaint includes four references to the defendants' public statements about Imperial's purchases of refined sugar from third-parties.  First, in the 2010 annual S.E.C. filing, dated December 29, 2010, the first day of the putative class period, Imperial noted that, "[s]ales volumes increased 51.9% primarily due to the ramp up in production from the Port Wentworth refinery, partially offset by decreased sugar purchased from other producers." (Compl. ¶67; Docket Entry No. 42, Ex. A at 22).  Second, during the December 30, 2010 conference call, Sheptor explained that "[t]he refinery performance did not improve from the previous quarter forcing us to purchase contract coverage from suppliers, and in some cases causing default on contract delivery resulting in customer complaints — customer claims." (Compl. ¶69; Docket Entry No. 42, Ex. J at 2).  Third, during Imperial's May 10, 2011 conference call, Mechler acknowledged that "the results show that we oversold the second half of 2010 — overcommitted, and therefore, suffered some of the cover requirements for our customers, as we reported previously." (Compl. ¶90).  Fourth, during Imperial's August 5, 2011 conference call, Sheptor stated, "If you look at the third quarter, on a volume basis, we met all of our orders and so we are not constrained on a sales side by production." (Compl. ¶98).

Carpenters alleged that these statements contained misrepresentations and omissions relating to: (1) the amount of refined sugar Imperial purchased from third parties; (2) the additional costs of those purchases as compared to sugar Imperial itself refined; (3) the impact of those purchases on Imperial's profit margins; (4) the fact that some of the companies Imperial purchased refined sugar from were its competitors; and (5) the fact that Imperial provided those competitors with internal financial information that gave them an even greater advantage.

Carpenters acknowledges that Imperial publicly disclosed the fact of its refined-sugar purchases from third parties, including competitors. Carpenters alleged, however, that these statements incompletely disclosed and mischaracterized the volume of Imperial's outside purchases of refined sugar. Carpenters points to its allegations of statements by three anonymous sources, all former Imperial employees. A senior logistics manager allegedly stated that Imperial "purchase[d] refined sugar from domestic and Mexican sources," including, during the final year of his employment, 10 to 20 railcars from CSC Sugar, LLC on 5 or 6 occasions. (Compl. ¶51). A former senior buyer "knew of purchases of refined sugar" throughout his employment at Imperial, which ended on June 15, 2011. (Compl. ¶ 52). A former customer-service representative stated that Imperial bought sugar from Michigan Sugar "all the time" and "on a daily basis." (Compl. ¶53).[4]

---

[4]    The defendants contend that the former customer-service representative who Carpenters acknowledges was "contracted out" to work for Michigan Sugar "would not have had any knowledge about Imperial Sugar outside of the Company's interactions with Michigan Sugar . . . ." (Docket Entry No. 42 at 19 n. 9). In support, the defendants submitted a press release filed with the S.E.C. announcing, as part of a marketing agreement with Imperial, that Michigan Sugar Company "will assume responsibility for the sales and marketing of sugar production at MSC . . . . All of the administrative functions . . . including, invoicing, customer service and credit and collections will be handled by Imperial personnel." (Id., Ex. Q). Carpenters responds that the defendants' assertion is an improper "attempt to discredit Plaintiff's factual allegations and draw inferences at the motion to dismiss stage." (Docket Entry No. 48 at 16 n. 7). Carpenters's description of its anonymous former customer- service representative fails to meet the pleading requirements under the PSLRA and Rule 9(b). Carpenters has not stated with particularity where the former customer-service representative worked — in Michigan, Sugar Land, Port Wentworth, or elsewhere — or how and the extent

The confidential sources' statements fail under the heightened pleading standards required by the PSLRA and Rule 9(b).  To prevail on their theory that the defendants publicly played down the significance of their sugar purchases from third parties, Carpenters must allege that those purchases were, in fact, significant.[5]  The confidential sources' statements that the purchases occurred "on a daily basis" and "throughout" their employment are vague and imprecise.  The statements all relate to the frequency of the purchases, not their volume.  The statements do not show the volume of third-party purchases, production, or sales as compared to total purchases, production, or sales.  The most specific estimates of volume were provided by the senior logistics manager, who stated that during calender year 2010, Imperial purchased 50 to 120 railcars of refined sugar from CSC.  (Compl. ¶51).  But Carpenters failed to provide the court with any reference point for understanding how much refined sugar this is.  The defendants previously asked this court to take judicial notice of a reference guide suggesting that a bulk railcar can hold up to 200,000 pounds of sugar.  Carpenters objected on the basis that the source the defendants cited for this information was not sufficiently reliable under Federal Rule of Evidence 201.  In a March 30, 2013 order, this court agreed with Carpenters and granted its motion to strike the defendants' reference guide.  (Docket Entry No. 63).  Even if not reliable, however, the figure stated in the defendants' reference guide

---

to which he had access to information about Imperial outside his role in assisting transactions between Imperial and Michigan Sugar.  Several of the allegations based on the customer-service representative's statements appear to go beyond this role, including: (1) "[T]here were a handful of customer orders every day [that Imperial] could not meet," (Compl. ¶53), and (2) "Defendant Sheptor's knowledge of the problems at Port Wentworth was confirmed by the former Customer Service Representative, who stated that Defendant Sheptor held a monthly town hall meeting which took place during the middle of the month.  This former employee recalled that during the Town Hall meetings, Defendant Sheptor 'would always acknowledge the problems at Port Wentworth,'" (Compl. ¶57).

[5]  For this reason, the size of the purchases is relevant both to whether the defendants made material misstatements or omissions and whether any misstatements or omissions were material.

shows why it is necessary for Carpenters to allege the amount of refined sugar that Imperial purchased from CSC. Fifty to 120 railcars, each holding 200,000 pounds of sugar, amounts to 10 to 24 million pounds of sugar. Although that number may seem large, Imperial's S.E.C. filings reflect that in recent years it has sold between 1 and 3 billion pounds of sugar each year. This would make Imperial's refined-sugar purchases from CSC the sugar equivalent of no more than a drop in the bucket. Without allegations as to the amount of refined sugar purchased, in general or in relationship to the overall amounts purchased, produced, or sold, there is no basis for determining whether the defendants played down Imperial's refined-sugar purchases or whether the alleged misrepresentations were material.

Carpenters also fails to sufficiently plead the timing of the purchases from third parties. Carpenters states that they occurred during the final year of the senior logistics manager's employment with Imperial, which ended in January 2011. The class period did not begin until December 2010. Several of the defendants' alleged misrepresentations about Imperial's refined-sugar purchases related only to the latter part of 2010. Without a temporal or other tie between the amounts of the purchases, as well as the timing, and the alleged misrepresentations, the complaint allegations do not meet the pleading requirements.

Additionally, the defendants point out that the statements by the confidential informants are consistent with Imperial's public disclosures. Since 2002, Imperial has reported the volume of sugar that it sold and that it refined during each fiscal year in its S.E.C. filings. The S.E.C. filings contain the following information:

| Fiscal Year | Sugar Sold (Pounds) | Sugar Produced (Pounds) | Difference in Sugar Produced & Sugar Sold (Pounds) |
|---|---|---|---|
| 2002 | 4,200,000,000 | 3,820,200,000 | 379,800,000 |
| 2003 | 3,749,900,000 | 3,745,300,000 | 4,600,000 |
| 2004 | 3,219,600,000 | 3,223,000,000 | -3,400,000 |
| 2005 | 2,760,400,000 | 2,691,200,000 | 69,200,000 |
| 2006 | 2,818,300,000 | 2,845,100,000 | -26,800,000 |
| 2007 | 2,656,200,000 | 2,558,500,000 | 97,700,000 |
| 2008 | 1,850,100,000 | 1,673,200,000 | 176,900,000 |
| 2009 | 1,516,300,000 | 1,285,300,000 | 231,000,000 |
| 2010 | 2,302,900,000 | 2,314,000,000 | -11,100,000 |
| 2011 | 1,794,600,000 | 1,570,700,000 | 223,900,000 |

Carpenters did not allege that Imperial's reported figures were inaccurate. Carpenters contends, correctly, that the difference in sugar produced and sold in a given year is not necessarily equivalent to the amount of sugar purchased from third parties during that year. Sugar produced in one year might be stored for a time and sold in the following year. But when, as here, the public information shows a consistent and readily identifiable pattern of refined-sugar sales exceeding production, it can be readily inferred that some refined sugar must be coming from outside sources.

Carpenters argues that the "sugar sold" and "sugar produced" figures in the S.E.C. report should not be given weight because they are disclosed separately in the annual filings "without any accompanying explanation as to how or why the figures are connected, or as to the negative implications of such connection." (Docket Entry No. 48 at 18). Even literally true statements and information can be framed in ways that make them misleading. In this case, however, the defendants repeatedly disclosed that at times during the 2010 fiscal year, Imperial had been forced

to purchase refined sugar from outside sources to meet customer orders.  Indeed, the defendants cites

statements made by financial analysts that are consistent with finding Imperial's public disclosures

sufficiently clear to have been understood accurately by the market.  For example, in its December

29, 2010 report, a financial analyst at Rafferty Capital Markets LLC noted that, "[t]his year, the

company produced more sugar than it sold, a first from what we can tell.  Historically, IPSU sells

a small portion of 'other' sugar that it does not produce in its facilities."  (Docket Entry No. 42, Ex.

O at 1). Courts have rejected similar liability theories.  *See, e.g., In re Merck & Co., Inc. §. Litig.*,

432 F.3d 261, 270-71 (3d Cir. 2005) ("[Plaintiff] is trying to have it both ways: the market

understood all the good things [the company] said about its revenue but was not smart enough to

understand [the allegedly opaque] disclosure.  An efficient market for good news is an efficient

market for bad news.").

Carpenters also alleged that the defendants misrepresented or obscured the costs to Imperial

of its refined-sugar purchases and the impact of those costs on its overall financial performance.

One of the sources cited, the former senior buyer, stated that purchasing sugar from copackers cost

"15–20% higher than Imperial had to pay."[6]  (Compl. ¶49).  He also stated that "he was sure that

purchasing the refined sugar impacted margins" because "they were charging more for the sugar

than if we refined it ourselves."  (Compl. ¶55).  The former senior logistics manager stated that the

purchases of Imperial's refined sugar "blew up" Imperial's transportation budget.  (*Id.*).

These allegations do not support an inference that the defendants' statements about

Imperial's refined-sugar purchases were misleading.  Sheptor stated that Imperial was "forc[ed] .

_____

[6]  The phrase "than Imperial had to pay" is unclear.  The court assumes, based on context, that
Carpenters intends to compare the price Imperial was required to pay copackers for refined sugar with the
cost of refining its own sugar.

. . to purchase contract coverage from suppliers." (Compl. ¶69). Mechler stated that Imperial "suffered some of the cover requirements for our customers." (Compl. ¶90). A reasonable investor would understand from these statements that it cost Imperial more to obtain refined sugar from third parties than to refine the sugar itself.

Carpenters's allegations about the impact of these purchases on Imperial's bottom line also fail for lack of specificity. The cited statement by the former senior buyer, that "he was sure" Imperial's refined-sugar purchases "impacted margins," is both vague and imprecise. (*See* Compl. ¶55). Carpenters did not allege what that impact was. The language the buyer used — "he was sure" — suggests a lack of personal knowledge of the impact of Imperial's sugar purchases on its financial performance. If, as the complaint allegation suggests, his statement was an assumption based on the disclosed fact that Imperial had to pay more to purchase refined sugar from third parties than to refine it internally, the assumption is one the market itself could have made from Sheptor and Mechler's statements that Imperial bought refined sugar from third parties for cover requirements.

Carpenters asserts that the defendants concealed the truth in what they disclosed because they described the companies they purchased refined sugar from as "suppliers," and omitting that these were also Imperial's competitors. A "claim of incomplete disclosure is actionable only if what [the defendants] said is misleading." *Indiana Elec. Workers*, 537 F.3d at 541. To the extent that any company selling refined sugar to the market competes with Imperial, a reasonable investor would not have been misled. A reasonable investor would have understood from the defendants' disclosures that Imperial's refined-sugar purchases from third parties included purchases from its competitors.

42

Carpenters also alleged that the defendants concealed the fact that Imperial had to provide its own financial information to the companies from which it purchased refined sugar. Carpenters alleged that the senior buyer stated that it "is a major threat if [competitors] have your price points." (Compl. ¶50). But Carpenters did not allege and does not identify in response to the motion to dismiss what information Imperial provided other than "price points." Carpenters alleged that disclosing this information was harmful to Imperial, but there is no allegation as to how confidential the information was or in what way it harmed Imperial. There is no basis in the facts alleged to infer that Imperial would have performed better if it had not disclosed the information.

Nor has Carpenters alleged facts showing that the defendants had a duty to disclose that Imperial had provided some internal financial information to competitors. If the information given to Imperial's competitors was the type of information that accompanies purchases from third parties, including competitors, then the fact that such information was disclosed would have been clear from the fact that Imperial was making such purchases. In sum, Carpenters has not alleged facts sufficient to support an inference that the defendants made material misrepresentations or omissions relating to their refined-sugar purchases from third parties.

The defendants also move to dismiss the refined-sugar-purchasing allegations for insufficiently pleading scienter. Carpenters responds that because Imperial's business centered around refined sugar sales, by virtue of their senior executive positions, Mechler and Sheptor were likely aware of important issues affecting those sales. Carpenters cites the Fifth Circuit's decision in *Nathenson v. Zonagen*, 267 F.3d 400 (5th Cir. 2001), in which the court held that the individual defendants' positions within the defendant company enhanced the plaintiffs' scienter allegations. The court "recognize[d] that normally an officer's position with a company does not suffice to create

43

an inference of scienter." *Id.* at 424; *see also Ind. Elec. Workers*, 537 F.3d at 535 ("[Fifth Circuit] caselaw makes clear that pleading[s] of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions with the company." (internal quotation marks omitted)).  The court noted, however, that there were "a number of special circumstances . . . which, taken together, suffice to support a different result in the present case." *Nathenson*, 267 F.3d at 425.  Zonagen, the defendant company, was small and had only three dozen full-time employees; it was essentially a one-product company; and the alleged misrepresentations were about the patent protection for that product, the most crucial issue for the pharmaceutical company.

The Fifth Circuit and other courts have been reluctant to apply *Nathenson*'s limited exception to the particularized pleading required for scienter.  *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867, 868 (5th Cir. 2003) (rejecting the plaintiffs' argument that "the failure of Azurix's core business—water privatization projects—supports the inference that defendants knew, or recklessly disregarded, Azurix's prospects for success" and holding that the plaintiffs must "identify exactly who supplied the information or when they knew the information."); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 ("A pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company."); *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 754 (S.D. Tex. 2003) ("Plaintiffs have relied on the judicially created presumption that facts critical to a business's core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its key officers. . . . [T]he purpose of the PSLRA's particularized pleading requirements leads this Court to find that such an imputation, without some additional facts such as exposure to content-identified internal corporate documents (and who drafted them, who received them or how plaintiffs learned of them)

44

or specific conversations or attendance at specified management or board meetings dealing with such problems, is inadequate to plead scienter." (quotation marks and citations omitted)); *see also Elam v. Neidorff*, 544 F.3d 921, 929 (8th Cir. 2008) (interpreting *Rosenzweig* as rejecting the "core operations method of pleading scienter"). Carpenters has also not shown that the refined-sugar purchases were so essential to Imperial's operations that knowledge could be presumed under the limited circumstances permissible under *Nathenson*.

Carpenters also alleged that both Mechler and Sheptor were aware of Imperial's refined-sugar purchases because both individuals participated in monthly conference calls during which pricing and margins were discussed. Carpenters has not sufficiently alleged that Mechler knew the details of Imperial's refined-sugar purchases, including their volume, cost, and effect on Imperial's bottom line. The complaint did not specify the extent to which refined-sugar purchases from third parties were reviewed during the conference-call discussions about pricing and margins. Mechler's acknowledgment in a May 10, 2011 conference call with investors that "the results show that we oversold the second half of 2010 — overcommitted, and therefore, suffered some of the cover requirements for our customers, as we reported previously," (Compl. ¶90), shows a general knowledge of Imperial's refined-sugar purchases, but not the detailed or specific knowledge that is necessary to support an inference of scienter.

Carpenters alleged that Sheptor was aware of the purchases from third parties because he received daily Late Reports over email showing unfilled customer orders, (Compl. ¶38); he was frequently in the master planner's office discussing what sugar sources Imperial would use to fill customer orders, (Compl. ¶58); and his approval was required for all sugar purchases, (Compl. ¶59). Carpenters sufficiently alleged that Sheptor knew about the specifics of Imperial's refined-sugar

purchases.  But merely knowing about those purchases is not sufficient to raise an inference of scienter under the applicable case law.  Such an inference requires allegations showing "an intent to deceive, manipulate or defraud or that severe recklessness in which the danger of misleading buyers or sellers is either known to the defendant or is so obvious that the defendant must have been aware of it." *R2 Invs. LDC*, 401 F.3d at 643.  As noted above, Carpenters has not alleged facts that, assumed as true, would show that Sheptor made material misrepresentations or omissions about those purchases.  Given the statements Sheptor made during the investor conference calls, given the statements attributed to him in other disclosures, and given the other public disclosures Imperial made, Carpenters also failed to allege facts showing that Sheptor or the other defendants described Imperial's refined-sugar purchases from third parties with an intent to defraud or deceive.  "Viewed holistically," Carpenters did not sufficiently allege facts supporting the required strong inference of scienter relating to the disclosures about Imperial's refined-sugar purchases.

### 2.     The Alleged Misrepresentations About the Use of Copacking

Carpenters made similar allegations about Imperial's reliance on third parties to copack sugar that it refined after its internal capacity to pack was compromised.  In the consolidated complaint, Carpenters pointed to a single comment by the defendants about Imperial's use of copacking.  In the December 29, 2010 10-K filed with the S.E.C., Imperial stated, "[w]e . . . contract for production, throughput and storage at a number of copackers, warehouses and distribution stations.  Co-packers are used under contract for small volume specialty products."  (Compl. ¶67).  Carpenters contends that this disclosure "failed to adequately apprise the market of the true nature, extent, and circumstances of [Imperial's] co-packing practices" and did not reveal that Imperial "was forced to

46

turn to competitors to extensively co-pack its products due to extensive operation issues . . . and that

such practices were financially detrimental to the Company."  (Docket Entry No. 48 at 22-23).

The complaint made the following allegations about Imperial's copacking practices:

- The former senior buyer stated that, "of the co-packers that Imperial used . . . U.S. Sugar was by far the biggest."  (Compl. ¶46).

- U.S. Sugar packaged five or six truckloads a week for Imperial Sugar (with each truckload containing around 48,000 pounds).  (Compl. ¶48).

- Imperial "was getting charged $0.15 to $0.20 more per pound than if it packed the sugar itself."  (Compl. ¶50).

- Imperial paid U.S. Sugar "tolling fees" of approximately $500,000 per month for copacking its products, which "added significant operating costs for Imperial." (Compl. ¶48).

- The use of copackers "increased the Company's operating costs and compressed the Company's margins."  (Compl. ¶1).

- Fifty percent of Imperial's "[r]etail business" was copacked or packed by a competitor, including "all of the brown sugar, some powdered and the two pound, four pound, five pounds, and ten pound granulated was all co-packed."  (Compl. ¶ 44).

Carpenters  argues that Imperial misled investors by implying that its copacking practices

were confined to "small volume specialty products" when it was actually relying on others to pack

around 50 percent of its "retail" sugar.  Carpenters does not define what "small volume specialty

products" or "retail business" refers to.  Carpenters alleged generally that "[i]n some instances,

Imperial would send refined sugar to be packed as well," but did not allege what amount of

"nonspecialty" refined sugar was packed by third parties.

Carpenters failed to sufficiently allege facts showing that Imperial had a duty to disclose

additional information about its copacking practices.  The defendants point out that during the first

quarter of fiscal year 2011, Imperial incurred and reported $231 million in cost-of-sales expenses.

47

(Docket Entry No. 42, Ex. B at 3).  Carpenters did not allege that Imperial failed to include its copacking costs in its reported expenses.  According to Carpenters's estimates of $500,000 in monthly tolling expenses, $1.5 million, or 0.6 percent of quarterly cost-of-sales expenses, were attributable to copacking fees to U.S. Sugar.  (Docket Entry No. 42, at 16).  Similarly, according to Carpenters's estimates, Imperial's "biggest" copacker "by far," U.S. Sugar, would have packaged about 15 million pounds of sugar over the course of a year.  (Compl. ¶46).  This amounts to less than 1 percent of the 1,794,600,000 pounds of sugar Imperial sold in 2011 and an even smaller proportion of the sugar it sold in 2010.  (Docket Entry No. 42, Ex. N at 7).  Assuming Carpenters's allegations about copacking costs are true, Imperial would have paid an additional $2.25 to $3 million for U.S. Sugar to copack 15 million pounds of refined sugar at between $0.15 and $0.20 per pound. Carpenters fails to allege the relative amounts of costs involved, but what it did allege fails to support an inference of a material misrepresentation.

Carpenters contends that the figures Imperial disclosed during the class period and pointed to in the motion to dismiss fail to take into account Imperial's use of copackers aside from U.S. Sugar.  Eight different copackers were identified in the complaint.  (Compl. ¶ 45).  But Carpenters failed to allege or provide any specific information about the volume of sugar that these other companies copacked and how it relates to the volume of sugar Imperial continued to pack itself.  The information that Carpenters did provide — that U.S. Sugar was "by far" Imperial's "biggest" copacker — suggests that those other companies may not have significantly contributed to the volume of copacked sugar Imperial purchased.  Carpenters's allegation that copacking increased Imperial's operating costs and decreased its profit margins is vague, imprecise, and lacking in context.  Moreover, it is consistent with information Imperial disclosed during the class period .

In opposing dismissal, Carpenters also argues that Imperial falsely implied that copacking was routine. Imperial's disclosures about copacking in its annual reports for fiscal years 2009 and 2011 were similar to the disclosures it made in fiscal year 2010. (Docket No. 42, Ex. N at 7 & 15; Ex. L at 6 & 15 (both noting that "[c]o-packers are used under contract for small volume specialty products" and that "[w]e . . . contract for production, throughput and storage at a number of co-packers")). Carpenters did not allege facts describing the extent to which Imperial's copacking practices in 2010 and 2011 differed from its prior practices. The complaint did not include allegations comparing Imperial's copacking practices before 2010 with its practices during the class period.[7] The former senior buyer on whom Carpenters relies for many of its copacking allegations did not begin working for Imperial until June 2010. Carpenters acknowledged in the complaint that Imperial already "had a co-packing arrangement with U.S. Sugar" by then. (Compl. ¶46). In sum, Carpenters has not alleged with sufficient particularity that the defendants made material misrepresentations or omissions about Imperial's use of copacking.

Carpenters relies on the same scienter allegations for the representations about copacking as for the representations about refined-sugar purchases. The scienter allegations about copacking disclosures fail for the same reasons the scienter allegations about refined-sugar-purchase-disclosures failed.

### 3.      The Alleged Misrepresentations about the Port Wentworth Refinery

Carpenters alleged that the defendants made false and misleading statements about the Port Wentworth refinery's repairs, improvements, and production capacity. Carpenters alleged that these

---

[7] Carpenters alleged that Imperial's copacking arrangements gave its competitors access to proprietary pricing and customer information, but not how this harmed Imperial. These allegations fail for the same reasons as the Carpenters' similar allegations concerning Imperial's refined-sugar purchases.

statements falsely implied to the market that the Port Wentworth refinery had "turned a corner." (Compl. ¶9; Docket Entry No. 48, at 25).

In the December 2010 conference call, the defendants stated that in October 2010, Imperial had made changes in the Port Wentworth refinery process that had improved sugar yields and quality and lowered reprocessing costs.  Sheptor stated that "[i]n many ways, this change in the refining process was a huge success and a critical step forward to returning the refinery to pre-tragedy capacity." (Compl. ¶69).  During the February 7, 2011 conference call, Sheptor stated in his opening remarks that "[o]perations during the first six weeks of the quarter were remarkably improved versus previous quarters due to the Port Wentworth refinery process change completed the first week of the fiscal year.  Daily melt rates steadily improved with the number of days surpassing the historical capacity." (Compl. ¶78).  During the May 11, 2011 conference call, Sheptor stated that "[r]efinery yields have substantially improved and are approaching our historical best practice.  This is a result of process improvements completed in the first quarter . . . .  Production improvements at Port Wentworth and Gramercy have increased service levels to their highest levels since 2008, regularly exceeding 96%." (Compl. ¶ 88).

Carpenters alleged that contrary to these statements, Port Wentworth continued to experience operational problems during this period.  The former senior manager of logistics stated that Port Wentworth was a "money pit."  (Compl. ¶33).  The former senior buyer estimated that Port Wentworth was running at only 40 percent capacity during his employment between June 2010 and June 15, 2011.  (Compl. ¶32).  Imperial's insurance proceeds from the accident at Port Wentworth covered only repairs to the packaging equipment.  According to the former process-engineer team

leader, "[t]here was no money to fix the old refining equipment." (Compl. ¶33).  He explained that Imperial "went through two years of hell trying to get that old mill to run." (*Id.*).

The complaint falls short of alleging that defendants materially misrepresented the Port Wentworth refinery's condition.  First, the complaint's allegations and related documents showed that Imperial included in its quarterly disclosures objective measures of its melt rates and sugar production.  (Docket Entry No. 42, Ex. A at 6; Ex. B at 16; Ex. C at 18).  Those numbers showed that Port Wentworth's sugar production and efficiency stayed below preaccident levels.  The numbers also showed that production and performance had shown improvement since the accident.  Carpenters has not alleged that these figures were reported incorrectly.  Second, in Imperial's 2010 end-of-the-fiscal-year filing, the defendants disclosed that "[o]perations at the re-built Port Wentworth refinery have yet to return to prior volumes and efficiencies." (Docket Entry No. 42, Ex. A at 13).  Third, the defendants disclosed the production constraints caused by the fact that Imperial had to rebuild Port Wentworth's sugar silos between November 2010 and April 2011.  (Compl. ¶¶71, 75, 85, 88, 89).  Fourth, although the defendants spoke optimistically in December, February, and May about the probability that production at Port Wentworth would return to preaccident levels after the silos were reconnected, Carpenters has not pleaded that those comments were false at the time they were made.

Nor do Carpenters's allegations about Port Wentworth support a "strong" or "cogent" inference of scienter.  *See Tellabs I*, 551 U.S. at 310.  Carpenters made the following allegations relating to Sheptor's knowledge of Port Wentworth's day-to-day operations:

- Sheptor participated in daily calls with the Port Wentworth plant manager and received an "email tracker" each morning detailing plant performance.  (Compl. ¶57).

- Sheptor had an office at Port Wentworth, "was there all the time," and "had his own coveralls and hard hat." (*Id.*).

- Sheptor participated in a monthly town hall meeting at Port Wentworth that took place in the middle of each month and, during those meetings, he would "always acknowledge the problems at Port Wentworth." (*Id.*).

Carpenters did not allege facts suggesting that Mechler was knowledgeable about Port Wentworth's operations. The allegations as to Sheptor and Mechler, given the allegations about what they and Imperial did disclose, did not sufficiently plead that they made false statements with the intent to deceive.

On August 5, 2011, the defendants disclosed that Port Wentworth's performance had "not improved since reintegrating the silos in April" and that the "[r]eliability of equipment in the older sections of the refinery that were not replaced following the 2008 industrial accident has continued to challenge the operations team." (Compl. ¶96). Carpenters does not challenge the accuracy of this disclosure.

To plead scienter, Carpenters must allege: (1) that Sheptor and Mechler were aware when they made the positive predictions about improvements in Port Wentworth's productivity and production costs that even after the silo was rebuilt and reconnected, long-lasting mechanical issues would hamper production; or (2) that they recklessly disregarded the risk that such issues would affect production. *See Tellabs I*, 551 U.S. at 322–24. Carpenters's allegations that Sheptor was knowledgeable about Port Wentworth's performance do not suggest that, when he made the optimistic production predictions in December, February, and May, he was aware that mechanical problems would have a significant, long-term impact on production.

Carpenters alleged that the former senior logistics manager stated that Port Wentworth was a "money pit" and that the former process engineer team leader stated that Imperial "went through two years of hell trying to get that old mill to run." (Compl. ¶33). But these statements are both

vague and after-the-fact descriptions of Imperial's difficulties at the Port Wentworth refinery after the disclosed accident and resulting damage.  These statements are irrelevant to determining what specific information Mechler and Sheptor knew and when they knew it.  Nor do the statements from the confidential sources show why the statements and information that Mechler, Sheptor, and Imperial provided were false and misleading.  Carpenters's allegations do not give rise to a strong inference that the defendants knowingly misrepresented Port Wentworth's condition and productivity.

### 4.   The Alleged Misrepresentations About Margins, Competition, and Meeting Customer Orders

Carpenters alleged that the defendants made false and misleading statements about Imperial's ability to raise refined-sugar sales prices to compensate for the rising price of raw sugar.  These allegations included the following:

- Mechler stated during the December 30, 2010 analyst conference call, "[O]n a margin basis, we have been successful thus far at maintaining acceptable spreads between raw and refined sugar prices."  (Comp. ¶70).

- Mechler stated during the February 11, 2011 analyst conference call, "On a margin basis, thus far, we have largely been successful at maintaining acceptable spreads between raw and refined sugar prices."  (Comp. ¶79).

- Mechler stated during the February 11, 2011 conference call, "So I think that is a reasonable conclusion . . . that Port Wentworth, the way that it has been running, would, without Gramercy's higher cost, would improve gross margin."  (Comp. ¶80).

- Sheptor stated during the May 11, 2011 conference call, "Sales and operations improvements lead [sic] to significantly better margins.  Margins increased due to higher domestic prices, which outpaced raw sugar cost increases. Demand for Imperial's products is increasing, and with the tightening of supply in the US, we are experiencing expanding margins."  (Comp. ¶88).

Carpenters contends that these statements were false and misleading because they did not disclose constraints on Imperial's ability to raise prices.  Those constraints were competitive pressures exacerbated by the nonintegrated business model and deteriorating relationships with

customers resulting from difficulties filling orders after the Port Wentworth accident.  But the public disclosures Carpenters alleged in its complaint were descriptions of existing or historical margins, not predictions of what Imperial's future margins would be.  Carpenters did not allege that these historical statements about Imperial's margins, or the financial figures on which they were based, were false.

Additionally, Imperial repeatedly disclosed during the class period that competitive pressures and its business model might prevent it from raising its refined-sugar-sale prices to compensate for high raw-sugar costs.  Imperial's Form 10-K filed in December 2010 described the effects of competition by beet and foreign-cane-sugar producers on the prices of raw and refined sugar:

> Large sugar beet crops have historically led to relatively low refined sugar prices and small crops have led to relatively high refined sugar prices.  Recently, the availability of Mexican sugar for import under NAFTA has also influenced supplies and prices in the U.S.  A tightening U.S. supply/demand balance as reflected in USDA projections, as well as higher domestic raw sugar costs attributable to domestic as well as world market factors, have resulted in rising domestic prices during fiscal 2010.  We cannot predict the duration of any pricing trend or the effect a sustained trend may have on the sugar industry.

(Docket Entry No. 42, Ex. A at 9).  During the February 2011 conference call, Sheptor explained at length why Imperial was especially vulnerable to the effects of the spread between raw and refined sugar prices:

> I have been asked regularly why Imperial has not benefitted from the 30-year high prices that we are currently experiencing for white refined sugar.  Principally this is because our business is derived from the margin between raw sugar prices and white refined prices.  Higher raw sugar prices compress our margins unless we are able to recover these increases in white refined pricing.  Since 50% of our US industry does not have this cost pressure, we cannot always pass through price increases to cover these costs.

(Docket Entry No. 42, Ex. P at 2).  During that same call, Mechler noted, "Prices for both refined and raw cane sugar are at historically high levels and have demonstrated extraordinary volatility over the last 18 months."  (Comp. ¶79).

Imperial also disclosed that production limits after the Port Wentworth accident strained its relationship with customers.  In December 2010, Imperial acknowledged that "refinery performance did not improve from the previous quarter, forcing us to purchase contract cover from other suppliers, and in some cases causing default on contract delivery resulting in customer complaints — customer claims."  (Comp. ¶69).  Imperial stated that "[a] charge totaling $4.4 million was established in the quarter to account for unresolved customer claims."  (Id.).

Carpenters alleged that this statement was itself misleading because it did not disclose that, according to the former senior buyer,"[i]n the wake of [Imperial] not being able to supply sugar, due to the Port Wentworth explosion, [it] had to offer rebates and discounts in order to get customers back."  (Comp. ¶ 62).

The Port Wentworth accident occurred in 2008, but the class period did not begin until December 2010.  Carpenters did not allege  with specificity when Imperial's "rebates and discounts" were offered.  It is also unclear whether these rebates were offered generally or only for orders on which Imperial had defaulted.  If the latter, those rebates were clearly disclosed.

Carpenters also alleged that during the December 2010 analyst conference call, when an analyst asked whether Imperial anticipated having any "customer delay [or] customer cancellation charges" in the next quarter, Sheptor responded, "we are not aware of any customer issues that are not covered in the charges we took last year . . . ."  (Comp. ¶ 71.).  Carpenters alleged that this was

misleading, but did not allege that Imperial incurred new delay or cancellation charges in the first quarter of fiscal year 2011.

Carpenters alleged that Imperial lost Wal-Mart as a customer in February 2011 because it "missed too many shipments and could not supply the distribution centers," and that Imperial lost Meadowbrook Meats and Swank as customers in "early 2011" due to late deliveries.  (Comp. ¶ 41). But Carpenters did not allege facts showing that Imperial had a duty to disclose additional information relating to these events.  In its response to the motion to dismiss, Carpenters suggested that the duty to disclose arose from Imperial's prior December statement that it was not aware of any new customer charges.  But Imperial did not lose the Wal-Mart, Meadowbrook Meats, and Swank accounts until several months after that statement.  Carpenters also failed to plead facts suggesting that Imperial's problems with Meadowbrook Meats and Swank were large enough to be material to investors.

The allegations failed to plead either materiality or scienter sufficiently.  The complaint vaguely alleged that the defendants were aware of, but failed to disclose, constraints on Imperial's ability to raise prices.  The complaint alleged that, according to the former senior buyer, both Sheptor and Mechler "were very familiar with the problem of not being able to increase pricing."  (Comp. ¶ 60).  The complaint alleged that the former senior buyer participated in a monthly conference call that included Sheptor and Mechler, during which the participants discussed "what the market would bear for price and margins."  (*Id.*).  The complaint did not allege with specificity, however, what information discussed on those calls showed that Sheptor and Mechler knew Imperial could not raise prices or when that information was discussed.  *In re Franklin Bank Corp. §. Litig.*, 782 F. Supp. 2d at 378 (a confidential witness's unspecific statements that a defendant was "heavily involved" in "one

56

or two credit committees" gave rise to "no inference of scienter, much less an inference of strong

scienter").  The allegations in the complaint and the related documents are similar to those other

courts have found insufficient to show scienter.  *See Horizon Asset Mgmt.Inc.*, 580 F.3d at 763–65

(finding that repeated public disclosures of internal accounting control weaknesses weighed against

inferring that the defendants acted with scienter in reporting faulty financial figures); *ACA Fin. Guar.*

*Corp. v. Advest Inc.*, 512 F.3d 46, 66 (1st Cir. 2008) (finding that the plaintiffs did not adequately

plead scienter because the statement at issue "as a whole candidly laid out the sorry financial history

of the college and, for most of its estimates and projections as to a happier future, it provided accurate

and non-misleading information").

The allegations of material misrepresentations relating to the Port Wentworth refinery are,

in sum, insufficient.

### 5. The Alleged Misrepresentations About the Gramercy Plant and the LSR Joint Venture

Carpenters alleged that the defendants misrepresented and insufficiently disclosed the impact

that the loss of refining capacity at the Gramercy plant would have on Imperial's sales volumes and

financial health.  But the documents that are appropriately considered in analyzing the motion to

dismiss show that Imperial publicly disclosed the details of the LSR joint venture and the impact it

would have.  Imperial disclosed in the February 7, 2011 Form 10-Q that the company would

contribute "land and the existing refinery assets" to the LSR venture and that "[a]fter January 1, 2011,

the Company would continue to operate the small bag packing facility in Gramercy, with 3.5 million

cwt of refined bulk sugar purchased annually from LSR under a long term, supply agreement with

market–based pricing provisions."  (Docket Entry No. 42, Ex. B at 10).  Imperial also warned that

"[s]ales derived from the existing Gramercy refinery will be lower in future periods as a result of this

contribution, as only sales from the small bag packing operations will be consolidated in our results."
(*Id*. at 17).  Imperial stated that "[t]he Gramercy refinery's final quarter of operations prior to the LSR transition was challenging with reduced yields, higher energy and environmental costs as well as a lower average daily melt."  (*Id*. at 18).  Imperial included in the February 2011 Form 10-Q an estimate of the amounts of bulk and large bags produced at the Gramercy refinery that were sold. Imperial further stated that "[a]s a result of the delay in re–starting the Gramercy refinery, the Company was not able to operate its retail packaging operation in Gramercy as planned in January, reducing available packaged product for the retail channel of distribution by approximately 230,000 cwt." (*Id*. at 19).[8]  Carpenters did not allege that any of these disclosures were false.  These sobering disclosures provided investors with clearly stated information about the impact and risks of the Gramercy refinery's transition.  Carpenters has not alleged a basis to require the defendants to disclose more.  *See, e.g.*, *Solow v. Citigroup, Inc.*, No. 10 Civ. 2927(RWS), 2012 WL 1813277, at *4 (S.D.N.Y. May 18, 2012) (holding that the defendant "was not obligated to characterize its performance . . . in negative terms . . . or paint themselves in the most unflattering light possible" when the underlying disclosure was not alleged to be inaccurate); *In re CRM Holdings, Ltd. §. Litig.*, No. 10 Civ. 975(RPP), 2012 WL 1646888, at *27 (S.D.N.Y. May 10, 2012) ("So long as a corporation makes disclosure of material objective factual matters, it need not characterize or editorialize on those facts in any particular way." (citation omitted)); *In re Alcatel Alsthom §. Litig.*, MDL No. 1263, 2000 WL 34217789, at *10 (E.D. Tex. June 23, 2000) (finding that the defendant's

---

[8]  Imperial made similar disclosures the following quarter.  (Docket Entry No. 42-5 at 10, 16, 17, 19, 20).

failure to characterize information negatively is not actionable where the "underlying data, and the reasons therefore, were available to investors").

### 6.    Summary as to the Specific Allegations

The specific misrepresentations that Carpenters alleged, both affirmative statements and omissions, are insufficient to plead a claim for securities fraud on which relief can be granted.  Each of the specific alleged misrepresentation claims is dismissed, without prejudice and with leave to amend.

### C.    Loss Causation

The defendants argue that even if Carpenters sufficiently pleaded  material misstatements or omissions and scienter, the class-action complaint should be dismissed for failure to plead loss causation.  Under the PSLRA, a plaintiff must prove that a defendant's act or omission alleged to have violated the Exchange Act "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4 (b)(4).[9]  In *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), the Supreme Court held that loss causation incorporates traditional elements of proximate causation and economic loss.  To establish loss causation under § 10(b), it is not enough for a plaintiff to show that it bought stock at inflated prices and that the stock price declined after negative news was reported. *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 340–41 (5th Cir.

---

[9]  In 2011, the Supreme Court held that securities fraud plaintiffs seeking to invoke a rebuttable presumption of reliance based on what is known as the "fraud-on-the-market" theory need not prove loss causation in order to obtain class certification.  *See Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2186 (2011).  The Court's decision abrogated the Fifth Circuit's rule that plaintiffs in security fraud cases had to plead loss causation to obtain class certification.  *Erica P. John Fund* does not dictate the outcome in this case.  Here, the court is considering a motion to dismiss rather than a motion for class certification.  Carpenters must adequately plead loss causation to survive the defendants' motion to dismiss. *See  Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S. Ct. 1184, 1192 (2013) (confirming that loss causation continues to be an element of a claim under § 10(b))**.**

2010), *vacated on other grounds*, 131 S. Ct. 2179 (2011).  The loss must result from this truth having

"ma[de] its way into the marketplace," not as a result of "changed economic circumstances, changed

investor expectations, new industry-specific or firm-specific facts, conditions," or other factors

independent of the fraud.  *Dura Pharmaceuticals*, 544 U.S. at 342–43.

The Fifth Circuit requires plaintiffs to allege either (1) a "facially 'plausible' causal

relationship between the fraudulent statements or omissions and plaintiff's economic loss, including

allegations of material misrepresentation or omission, followed by the leaking out of relevant or

related truth about the fraud that caused a significant part of the depreciations of the stock and

plaintiff's loss" or (2) "enough facts to give rise to a reasonable hope or expectation that discovery

will reveal evidence of the foregoing elements of loss causation."  *Lormand*, 565 F.3d at 258.  The

Fifth Circuit has held that the notice pleading standard of Rules 8(a) and 12(b)(6), not heightened

pleading, is sufficient to plead loss causation.  *Id.* ("[W]e conclude that Rule 8(a)(2) requires the

plaintiff to allege, in respect to loss causation, a facially "plausible" causal relationship between the

fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material

misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud

that caused a significant part of the depreciation of the stock and plaintiff's economic loss or, as

*Twombly* indicates, the complaint must allege enough facts to give rise to a reasonable hope or

expectation that discovery will reveal evidence of the foregoing elements of loss causation."  *Id.*

(internal citations omitted)).  A court is "not authorized or required to determine whether the

plaintiff's plausible inference of loss causation is equally or more plausible than other competing

inferences, as [it] must in assessing allegations of scienter under the PSLRA."  *Id.* at 267.

The parties disagree as to what disclosures are needed to satisfy § 10(b)'s loss causation requirement. The Fifth Circuit addressed this issue in *Flowserve*, 572 F.3d 221. The defendants in that case argued that to prove loss causation, a plaintiff was required to show a "fact-for-fact" disclosure of information that fully corrected prior alleged misstatements. The plaintiffs argued that it was sufficient to show that the "true financial condition" of the company became publicly apparent, regardless of whether that condition corrected past misstatements. The Fifth Circuit held that neither position was entirely correct. The defendants were incorrect because "[i]f a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements [a]nd if a 'complete' corrective disclosure were required, defendants could immunize themselves with a protracted series of partial disclosures." *Id.* at 230 (internal quotation marks and citation omitted). The plaintiffs were incorrect because "undisclosed information cannot drive down the market price of a stock." *Id.* The court held that to establish loss causation, the disclosed information "must reflect part of 'the relevant truth' — the truth obscured by the fraudulent statements." *Id.*; *see also Lormand*, 565 F.3d at 261 ("[L]oss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation."). But a "loss caused solely by a general impression in the market that 'something is wrong' is insufficient to establish causation." *Flowserve*, 572 F.3d at 232.

Carpenters asserts that it may satisfy the loss-causation requirement under the "materialization-of-the-risk" theory. Under that approach, a plaintiff may plead that the "loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 107 (2d Cir. 2007). A misrepresentation is

61

"the proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005).

The materialization-of-the-risk theory of loss causation differs from the approach requiring a corrective disclosure. "Where the alleged misstatement conceals a condition or event which then occurs and causes the plaintiff's loss, it is the materialization of the undisclosed condition or event that causes the loss. By contrast, where the alleged misstatement is an intentionally false opinion, the market will not respond to the truth until the falsity is revealed—i.e., a corrective disclosure." *In re Initial Pub. Offering §. Litig.*, 399 F. Supp. 2d 298, 307 (S.D.N.Y. 2005) (footnote omitted). At least two circuits have approved of the materialization-of-the-risk theory of loss causation. *Schaaf v. Residential Funding Corp.*, 517 F.3d 544, 550 (8th Cir. 2008); *Ray v. Citigroup Global Markets, Inc.*, 482 F.3d 991, 995 (7th Cir. 2007). But reliance on this theory requires a plaintiff to "allege some specific misstatements or omissions made by the defendant that can be connected to the plaintiff's eventual economic loss." *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011) (summary order).

The Fifth Circuit has not adopted the materialization-of-the-risk theory.  Doing so may be foreclosed by the Fifth Circuit's analysis of loss causation in *Flowserve*.[10]  But Carpenter has failed to sufficiently plead loss causation even assuming that the materialization-of-the-risk theory applies.

Carpenters alleged that the defendants' August 5, 2011 disclosures led to a steep decline in Imperial's share price from $23.19 on August 4, 2011 to $7.79 on August 8, 2011.  Carpenters alleged that several disclosures were responsible for that decline:

- Imperial reported a $16.1 million net loss.  (Compl. ¶95).

- "Gross margin as a percent of sales was a negative 6.1% for the third fiscal quarter compared to 0.7% for the third quarter of fiscal 2010."  (Compl. ¶95).

- "Higher raw sugar cost which along with lower volumes reduced gross margin was the primary reason for the loss in the current quarter."  (Compl. ¶95).

- "[R]aw sugar costs in the fourth fiscal quarter should see little relief."  (Compl. ¶95).

- "Manufacturing costs for the quarter did not improve from the same period in the prior year.  The Port Wentworth's refinery's progress toward full production rates was hampered by raw sugar quality and mechanical reliability, including significant interruptions in the steam boilers providing power to the plant."  (Compl. ¶95).

- "We are examining a number of potential projects at the Port Wentworth refinery which are likely to maintain capital expenditures above historical capital replacement levels for the next several years."  (Compl. ¶97).

---

[10]   At least two district courts in this circuit have permitted securities-suit plaintiffs to rely on the materialization-of-the-risk theory of loss causation.  *See Aubrey v. Barlin*, 2010 WL 3909332, at *12 (W.D. Tex. 2010) (permitting the plaintiffs to rely on the materialization-of-the-risk theory); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 439 F. Supp. 2d 692, 706 (S.D. Tex. 2006) (permitting the plaintiffs to plead the materialization-of-the-risk theory of loss causation but noting that, when that case was decided, the Fifth Circuit had "not addressed loss causation since *Dura Pharmaceuticals* was issued").  Another court in this circuit, however, noted that although the Fifth Circuit has not directly commented on the validity of the materialization-of-the-risk theory, circuit case law appears to require a corrective disclosure to show loss causation.  *In re Dell Inc. §. Litig.*, 591 F. Supp. 2d 877 (W.D. Tex. 2008).

- "The reduction in quarterly sales was principally due to the loss of direct sales volumes from the Gramercy refinery, which has been operated since January 2011 by [LSR]."  (Compl. ¶95).

- "[W]e have not been successful yet in raising prices materially thus far this quarter."  (Compl. ¶98).

- "Domestic competition between Mexican imports and US producers has intensified throughout all channels."  (Compl. ¶96).

- "As a result of the Company's future cash needs, including for capital expenditures, . . . the Company's borrowing availability may be reduced to levels that would trigger the applicability of the financial covenants and other restrictions under the Credit Agreement.  In such an event, it is possible that the Company will not be in compliance with such covenants and will need to seek a waiver from its lenders in order to avoid an event of default under the Credit Agreement."  (Compl. ¶100).

The defendants contend that information about Imperial's use of copacking and its refined-sugar purchases from third parties could not have caused the stock price decline because the August 5, 2011 disclosures did not mention those practices.  Although the Fifth Circuit does not require "fact-for-fact" corrective disclosures for pleading loss causation, Imperial's prior statements about its copacking and refined-sugar purchases are too attenuated from the August 2011 public disclosures to satisfy § 10(b)'s loss-causation element.  *See Greenberg v. Crossroads Sys., Inc*., 364 F.3d 657, 667 (5th Cir. 2004) (the allegedly corrective disclosure was not sufficiently related to prior allegedly false statements about the speed of new routers because the disclosure made "no reference to increased router speed"); *Dell*, 591 F. Supp.2d at 910 ("The disappointing earnings or expected earnings statements identified by the Plaintiffs fail to reveal the falsity of any of Dell's prior representations, and therefore do not qualify as a corrective disclosure."); *Magruder v. Halliburton Co.*, Civ. No. 3:05-CV-1156, 2009 WL854656, at *15 (N.D. Tex.  Mar. 31, 2009) (holding that loss causation was not sufficiently pleaded because "[d]espite the myriad of statements identified in the subject Complaint, the Plaintiffs simply fail to connect the alleged misrepresentations with correlative

64

corrective disclosures during the Class Period.  A corrective disclosure, at a minimum, requires that the prior misrepresentation be identified, and that the fraud of the prior representation be revealed to the market . . . .").

Carpenters's loss-causation allegations are not "facially plausible" because they did not allege a "leaking out of relevant or related truth about the fraud" that caused the economic loss.  *Lormand*, 565 F.3d at 258.  And, as set out above, Carpenters has not sufficiently alleged actionable misrepresentations.  The materialization-of-the-risk theory it invokes requires it to "allege some specific misstatements or omissions made by the defendant that can be connected to [its] eventual economic loss." *Amorosa*, 409 F. App'x at 416.  If Carpenters amends and sufficiently alleges prior material misrepresentations or omissions corresponding to the August 5, 2011 disclosures, that will also affect the analysis of whether it sufficiently alleges § 10(b)'s loss-causation requirement.

## IV.    Control-Person Liability Under Section 20(a) of the Exchange Act

Carpenters alleged that the Sheptor and Mechler are liable as "control persons" of Imperial Sugar under § 20(a) of the Exchange Act.  (Compl. ¶146).  Section 20(a) imposes joint and several liability on "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder" for securities fraud.  15 U.S.C. § 78t(a). "Control person liability is secondary only and cannot exist in the absence of a primary violation." *Southland §. Corp.*, 365 at 383.  Because Carpenters's primary claims under § 10(b) have been dismissed, the § 20(b) claims are similarly dismissed under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  This dismissal is also without prejudice and with leave to amend.

## V.    Conclusion

The defendants' motion to dismiss is granted.  The dismissal is without prejudice and with leave to amend no later than **October 30, 2013.**  A status conference is scheduled for **November 14, 2013**, at 9:00 a.m. in Courtroom 11-B.

SIGNED on September 27, 2013, at Houston, Texas.

Lee H. Rosenthal
United States District Judge